#29182-a-PJD
**2020 S.D. 73**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

RICHARD SEIDEL,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
PERKINS COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ERIC J. STRAWN
Judge

* * * *

JASON R. RAVNSBORG
Attorney General

PAUL S. SWEDLUND
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellee.


TIMOTHY J. BARNAUD
Belle Fourche, South Dakota               Attorney for defendant and
                                          appellant.

* * * *

CONSIDERED ON BRIEFS
AUGUST 24, 2020
OPINION FILED **12/30/20**

#29182

DEVANEY, Justice

[¶1.]     Richard Seidel appeals his convictions for kidnapping, rape, aggravated assault, and commission of a felony with a firearm.  He claims that the circuit court abused its discretion in limiting defense counsel's closing argument; that the prosecutor engaged in misconduct during closing argument; and that the circuit court erred in denying his motion for judgment of acquittal.  He also claims that his sentence is cruel and unusual in violation of the Eighth Amendment.  We affirm.

## Factual and Procedural Background

[¶2.]     J.S. separated from her husband, Richard Seidel, sometime in 2015 after he had an affair, and in September 2017, she filed for divorce.  While they were separated, J.S. continued to work as a bookkeeper for a company owned by Richard—Bison Grain Company.  On November 2, 2017, when J.S. arrived at Bison Grain, Richard and an employee, Doug Lewton, were present.  At around 11:45 a.m., Richard told Doug to take his lunch break "like [he] normally do[es]."  Doug later explained that he thought Richard's statement was odd because he did not take a lunch break at a set time, but he nevertheless left Bison Grain.  Richard disputes what happened next; however, we restate the evidence and testimony "in a light most favorable to the jury's verdict."  *See State v. Huber*, 2010 S.D. 63, ¶ 2, 789 N.W.2d 283, 286.

[¶3.]     After Doug left, Richard and J.S. were alone at Bison Grain, and according to J.S., Richard asked her to help him process a transaction on the computer in the scale room.  J.S. complied, and as she was typing, Richard slipped a

zip tie around her neck, tightened it, and began choking her. She begged him to stop making it tighter. Richard then pushed J.S. to the ground and took her cell phone. J.S. blacked out shortly thereafter.

[¶4.] When J.S. awoke, she realized she was on her stomach on the floor of the scale room and the zip tie was still around her neck. She noticed that she had urinated and defecated, and her wrists and ankles were bound with zip ties. J.S. saw that Richard had a gun, and she thought he was going to kill her. According to J.S., Richard stood her up and put her in the backseat of his pickup, after which she blacked out again.

[¶5.] When J.S. awoke, she could hear the pickup traveling down a gravel road. Richard drove J.S. to their marital home outside of Bison where he continued to live after the couple had separated. He parked the pickup in the garage, then cut the zip tie from J.S.'s ankles and had her walk into the house while he pointed a gun at her back. As the two walked to the bedroom, J.S. noticed a white garbage bag with black draw strings on the kitchen counter. In the bedroom, J.S. noticed a rope tied to the bottom part of the headboard. Although Richard did not use the rope on J.S., she feared that he planned to rape and kill her.

[¶6.] Once in the bedroom, Richard used a utility knife to cut off J.S.'s coat, shirt, and bra. He also removed her jeans and underwear and took her into the master bathroom to shower and clean off the urine and feces. After the shower, Richard shaved J.S.'s pubic area with an electric razor. He then had J.S. perform oral sex on him at gunpoint. Next, he returned J.S. to the bedroom and bent her over the bed. She asked him to use a lubricant if he was going to do anything

-2-

anally. J.S. explained that Richard used lubrication from a tube in a bag under the bed and penetrated her both vaginally and anally. During the anal penetration, J.S. defecated, which upset Richard, so he took her to the shower again. Afterward, Richard told her that she needed to listen to him about their divorce. J.S. promised that she would stop the divorce, hoping this would prevent Richard from killing her. Richard then appeared to calm down. He cut the zip ties from her wrists but reminded her he had a gun and told her to put on other clothing.

[¶7.] J.S. walked from the bedroom to the laundry room to get dressed. At some point, she placed part of a zip tie that had been cut from her wrist on top of the refrigerator. According to J.S., Richard put her cut-up clothing in a white garbage bag and placed her underwear and the bedding in the washing machine. Thereafter, they left the house and drove to the airport where Richard stored his private plane. When they arrived, J.S. noticed that the door to the hangar was open and the blocks were removed from the plane's tires, neither of which were typical. At the airport, Richard cut the zip tie from J.S.'s neck and placed it in the white garbage bag. He got out of the pickup, taking the bag with him, and told J.S. to return in 20 minutes. He warned her that if she told the sheriff what happened he would shoot himself.

[¶8.] J.S. left the airport in the pickup after she saw Richard fly away in the plane. She then went to Bison Grain to get her cell phone. J.S. sent a snapchat message to her daughter-in-law Kristen Seidel around 1:30 p.m. informing her that she was "scared" and if she was "not back by 2," Kristen should "come look for [her]." J.S. testified that she returned to the airport to pick up Richard and drove

him to another house they owned by Bison Grain. She explained that after she dropped Richard off, he got into his Cadillac and drove off. In an attempt to have things appear normal, J.S. got into her own vehicle (a red dually pickup) and drove to the post office and bank.

[¶9.]    At approximately 1:50 p.m., J.S. returned to Bison Grain, and Kristen was there waiting for her. Kristen described J.S. as "pretty distraught" and noted that she was crying. J.S. told Kristen what had happened. Despite Kristen's urging, J.S. resisted telling law enforcement, claiming she did not want Richard to kill himself. Doug came in from the shop at this point, and both he and Kristen convinced J.S. to report what had occurred. Kristen took J.S. to the police station in Doug's pickup because J.S. did not want Richard to see her pickup leave Bison Grain or see it parked outside the police station.

[¶10.]    J.S. was too afraid to go into the police station, so Kristen went inside. After learning that the sheriff was not in town, Kristen asked a deputy to speak to J.S. outside in Doug's pickup. When Deputy Matthew Kindsvogel first approached J.S., he observed that she was crying and frantic in her movements and that she had a red mark on her neck. The deputy recorded his conversation with J.S. wherein she related what Richard had done to her. Deputy Kindsvogel photographed the marks on J.S.'s neck, wrists, and elbow and determined that J.S. should be seen by medical personnel. Kristen then took J.S. to a medical clinic in Bison. A physician assistant at the clinic observed that J.S. had broken blood vessels in her eyes, petechiae (pinpointed, round spots caused by broken capillaries) on her right forehead, abrasions on her elbow, and ligature marks on her wrists and

neck. He also observed that J.S. had bloody post nasal drip in her throat, and because of the trauma to her neck, he recommended that J.S. be taken to the emergency room at the hospital in Spearfish for an examination.

[¶11.] At approximately 5:30 p.m., Kristy Schumacher, a nurse specially trained in conducting examinations of sexual assault victims, examined J.S. During her initial assessment, Nurse Schumacher observed a ligature mark on J.S.'s neck which had "several stripes going vertically within it" consistent with the teeth of a zip tie. She also observed that the whites of both of J.S.'s eyes were red from "hemorrhaging in the eye sclera." The nurse further observed broken capillaries on the right side of J.S.'s forehead and eye. Although the nurse did not observe visible injuries to J.S.'s vagina or anus, she noted that J.S.'s vaginal and anal openings were very tender based on J.S.'s reaction of holding onto the bed railing tightly and crying during the examination.

[¶12.] While at the Spearfish hospital, Dr. Matthew Finke also examined J.S.'s injuries. Dr. Finke reported that J.S. had a subconjunctival hematoma on the lateral part of her left eye. He also reported that because of the hemorrhaging in her eye and J.S.'s reported tenderness around "the laryngeal cartilage, which is kind of the Adam's apple" part of the neck, he ordered a CT angiogram of the head and neck to rule out airway and vessel issues. The test indicated normal vessels and no fracture of the laryngeal cartilage.

[¶13.] After law enforcement's initial contact with J.S., officers located Richard as he was driving toward Bismarck, North Dakota. Law enforcement also obtained search warrants for Richard's residence, airplane, pickup, and Bison

Grain. During a search of the residence, law enforcement found J.S.'s jeans and undergarments in the dryer and bed linens in the washing machine. They also found a bag containing sex paraphernalia and lubricant on a shelf in the closet of the master bedroom. Officers found a box of white garbage bags with black draw strings in a closet and a portion of a zip tie on the top of the refrigerator. Although the officers did not find the specific garbage bag taken by Richard when he flew away in his airplane, they did uncover a portion of a zip tie on the floor inside the plane. Various items were submitted for testing at the South Dakota Forensic Laboratory. Forensic examiners identified J.S.'s DNA on swabs from Richard's penis, from the partial zip tie located on top of the refrigerator, and from an electric razor head found in the master bathroom. They also determined that Richard could not be excluded as a source of the DNA obtained from the vaginal swabs collected from J.S.

[¶14.] On November 14, 2017, a grand jury indicted Richard with alternative counts of kidnapping, and one count each of rape, aggravated assault, and commission of a felony with a firearm. He pled not guilty, and a jury trial was held on July 22–26, 2019. The State called numerous witnesses, including J.S., Kristen, Doug, multiple law enforcement officers, Dr. Finke, and Nurse Schumacher. Richard's defense theory centered on his claim that his entire interaction with J.S. on November 2 was consensual, including the sex acts.[1] Defense counsel's opening statement alluded to a history between Richard and J.S. of rough but consensual

---

1. The trial transcript refers to "J.N." rather than "J.S." because by the time of trial, Richard and J.S. were divorced and she was no longer using her married name.

sex. Defense counsel called multiple witnesses to testify about J.S.'s demeanor and behavior within an hour of the alleged incident, and within several days and months after the incident, to suggest that her behavior was not consistent with someone who had been violently attacked and raped.

[¶15.] After the State rested, Richard moved for judgment of acquittal on all counts. The court denied the motion. Richard renewed the motion after the defense rested, but the court denied it again. Before closing argument, the State filed two motions in limine—one to preclude defense counsel from arguing that Richard and J.S. had engaged in consensual sex on the date in question, and the other to specifically preclude any mention of Richard and J.S. engaging in "erotic asphyxiation." The latter motion pertained to defense counsel's comment to the jury during his opening statement that Richard and J.S. had previously "engaged in something called 'erotic asphyxiation', where a person's breath is held by a small cord-type deal that was actually a pet collar to enhance an orgasm." The State asserted that defense counsel should be precluded from making such an argument in closing because no evidence had been admitted at trial to support this suggestion. The court denied the State's motion to preclude defense counsel from arguing the acts were consensual but granted the State's motion precluding defense counsel from referring to erotic asphyxiation.

[¶16.] Ultimately, the jury found Richard guilty of first-degree kidnapping, rape, aggravated assault, and commission of a felony with a firearm. The circuit court sentenced him to 45 years for the kidnapping, 25 consecutive years for the

rape, five consecutive years for the commission of a felony with a firearm, and 15 concurrent years for the aggravated assault.

[¶17.]     Richard appeals, asserting the following issues for our review:[2]

1.     Whether the circuit court abused its discretion when it granted the State's motion in limine regarding erotic asphyxiation.

2.     Whether prosecutorial misconduct occurred, depriving Richard of his right to a fair trial.

3.     Whether the circuit court erred in denying Richard's motion for judgment of acquittal.

4.     Whether cumulative error occurred, denying Richard of his right to a fair trial.

5.     Whether Richard's sentence is grossly disproportionate in violation of the Eighth Amendment.

### Analysis and Decision

### *1.     Whether the circuit court abused its discretion when it granted the State's motion in limine regarding erotic asphyxiation.*

[¶18.]     Richard claims he "was deprived of a key argument in his case when the [circuit] court granted the State's motion in limine regarding erotic asphyxiation." He asserts that there was sufficient evidence in the record to allow the jury to consider this defense. In particular, he argues that the jury could have reasonably inferred that the marks on J.S.'s neck were the result of erotic asphyxiation because there was a lack of evidence, testimony or otherwise, to support J.S.'s claim that she was violently attacked. He also claims that the inference is reasonable because, in his view, the red marks on J.S.'s neck were not

---

2.     Richard's counsel on appeal is different than his counsel at trial.

consistent with her claim that the zip tie was so tight that she blacked out, or with her claim that Richard cut the zip tie off with a utility knife.[3]  Finally, he asserts that although J.S. denied engaging in erotic asphyxiation on prior occasions, his contrary argument is supported by the bag of sex toys found in the Bison residence.[4]

[¶19.]        Richard posits his claim as a denial of his right to present his theory of the defense.  However, the circuit court did not bar Richard from presenting evidence in support of his theory that J.S.'s injuries were the result of consensual sexual acts, nor did the court prohibit defense counsel from arguing the same.  The court only precluded defense counsel from specifically referring to erotic asphyxiation.  The court's ruling was based on a finding that there were no facts introduced at trial to support the suggestion that Richard and J.S. had engaged in erotic asphyxiation either before or during the charged offenses.  The court noted that although "there was mention of sex toys . . . there was no buildup of facts with regard to previous uses of those items" or "any testimony with regard to [ ] the erotic asphyxiation."

[¶20.]        It is well settled that in closing argument, "[c]ounsel has a right to discuss the evidence and inferences and deductions generated from the evidence

---

3.    In response to similar arguments defense counsel made to the circuit court, the State pointed to defense counsel's failure to account for the fact that a gun was used, and that J.S. had passed out, had injuries to her neck, petechiae on her face, and blood in her eye.  More importantly, the State noted that her wrists were bound and injured.  The State asserted that defense counsel cannot "make up facts" or "throw things out to confuse the jury, [or] prejudice the jury."

4.    The only identifiable items in a photo of the bag of sex toys introduced at trial are a dildo and a tube of lubricant.

presented." *State v. Patterson*, 2017 S.D. 64, ¶ 20, 904 N.W.2d 43, 50 (quoting *State v. Smith*, 1999 S.D. 83, ¶ 42, 599 N.W.2d 344, 353). However, "[c]losing arguments are not evidence", *see Smith*, 1999 S.D. 83, ¶ 48, 599 N.W.2d at 354, and courts may limit arguments "to the facts in evidence and reasonable inferences flowing therefrom", *see Richardson v. Bowersox*, 188 F.3d 973, 980 (8th Cir. 1999) (citation omitted). We review the circuit court's decision to grant the State's motion in limine for an abuse of discretion. *See Fix v. First State Bank of Roscoe*, 2011 S.D. 80, ¶ 23, 807 N.W.2d 612, 619 (reviewing the court's evidentiary ruling related to closing argument for an abuse of discretion); *State v. Bausch*, 2017 S.D. 1, ¶ 12, 889 N.W.2d 404, 408 (reviewing an in limine ruling for an abuse of discretion).

[¶21.]     A review of the trial record supports the circuit court's observation that Richard did not present any evidence to support his erotic asphyxiation theory. The only mention of erotic asphyxiation during the entire trial was when defense counsel posed the following questions and received the following responses from J.S.:

> Q:     And you engaged in erotic asphyxiation because that's something the two of you had done before; isn't that true?
> A:     Never.
> Q:     And he used a small little cat collar around your neck that you wanted him to use; isn't that true?
> A:     No.
> Q:     And you're the one who brought those zip ties in there; isn't that correct?
> A:     No.

Richard did not testify at trial, so J.S.'s testimony denying such conduct was not refuted. Defense counsel tried to broach the general topic of erotic asphyxiation by asking Dr. Finke if "there are ways for people to engage in manual strangulation to

enhance the sexual pleasure," but the State objected to the question as "[b]eyond the scope of this witness", and the court sustained the objection. Defense counsel was nevertheless allowed to elicit from Dr. Finke that he could not "tell by looking at a person's neck whether they engaged in the activity willingly or not[.]" However, no witness provided testimony supporting a claim that Richard and J.S. had previously engaged in such willing activity, and defense counsel conceded in his argument to the court that he was "not allowed to talk about cat collars because that did not come in." Because there was simply no evidence in the record from which the jury could reasonably infer that Richard and J.S. engaged in erotic asphyxiation, the court did not abuse its discretion in precluding such an argument.

[¶22.] Despite the circuit court's ruling, defense counsel was allowed, over the State's objection, to argue to the jury that J.S. had consented to being bound. Counsel asserted that "one would not expect to see defensive marks . . . [b]ecause that would mean she was going along with it." He then noted that because there were no claw marks on J.S.'s neck and her long fingernails were all intact, the evidence suggested she was not being choked involuntarily. In addition, defense counsel pointed out that by the time the doctor saw J.S. later in the evening on the day of the alleged assault, the striation marks from the zip tie on her neck were no longer visible. In counsel's view, the fading marks would be "consistent with [J.S] going along with this." Finally, counsel pointed to the evidence in the record suggesting that J.S. had gone back to the marital home after the alleged assault and suggested this was inconsistent with someone who had just been raped at this

location.[5]  Therefore, we conclude that Richard was not prevented from presenting the central theory of his defense to the jury.

### 2.    *Whether prosecutorial misconduct occurred, depriving Richard of his right to a fair trial.*

[¶23.]    Richard contends the prosecutor committed misconduct during closing argument by telling the jury that Dr. Finke had testified it would not be possible for J.S. to inflict these wounds upon herself.  Richard asserts this was a misrepresentation of the doctor's testimony.  Richard also claims that the prosecutor "deceptively described" a letter Richard had written to J.S. by characterizing it "in a way that was likely to mislead the jury as to its contents." He acknowledges that the letter was admitted at trial, but claims the prosecutor committed misconduct because he "plainly insinuated that a letter tantamount to a confession was among the evidence in the record" when the letter "had barely been mentioned during the course of the trial, and its contents were never laid out for the jury[.]"  Finally, Richard asserts that the prosecutor knowingly proffered false testimony from J.S. about the gun she claimed Richard had used, and also proffered misleading testimony from J.S.'s divorce attorney regarding a civil suit she filed— after the trial was concluded—against Richard for the same acts for which he was being tried in the criminal case.

---

5.    Defense counsel suggested that the reason J.S. went back to the house was to plant evidence, namely the zip tie on the refrigerator and a ziplock bag of bullets in the pocket of Richard's jeans found in a clothes hamper.  The overarching theory of the defense was that J.S. engaged in all of these acts in order to use them as a basis for obtaining a more favorable divorce settlement or a monetary award against Richard in a civil lawsuit.

[¶24.] Richard's trial counsel did not object to any of these alleged instances of prosecutorial misconduct. Richard therefore requests that we review these claims for plain error. Under SDCL 23A-44-15, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of a court." "To establish plain error, an appellant must show '(1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if (4) it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Bausch*, 2017 S.D. 1, ¶ 27, 889 N.W.2d at 412 (alteration in original) (quoting *State v. Buchhold*, 2007 S.D. 15, ¶ 22, 727 N.W.2d 816, 822).

[¶25.] It is well established that in closing argument, "[c]ounsel has a right to discuss the evidence and inferences and deductions generated from the evidence presented." *Smith*, 1999 S.D. 83, ¶ 42, 599 N.W.2d at 353. Therefore, "[h]e or she may 'discuss the evidence, pointing out discrepancies and conflicts in the testimony, and argue that the evidence in the record supports and justifies a conviction[.]'" *Id.* ¶ 46, 599 N.W.2d at 354 (citation omitted). However, a prosecutor "may not seek a conviction at any price." *Id.* ¶ 42, 599 N.W.2d at 353. As such, "[p]rosecutorial misconduct implies a dishonest act or an attempt to persuade the jury by use of deception or by reprehensible methods." *State v. Bariteau*, 2016 S.D. 57, ¶ 23, 884 N.W.2d 169, 177 (citation omitted).

[¶26.] Here, a review of the record does not support Richard's characterization of the prosecutor's conduct, let alone show that prosecutorial misconduct occurred. First, the prosecutor did not misrepresent Dr. Finke's

testimony. Rather, the prosecutor explained the doctor's responses to defense counsel's cross-examination regarding hypothetical scenarios where similar injuries could result from activities other than someone being unwillingly strangled.

[¶27.] During trial, in response to defense counsel's question about kids holding their breath under water and bursting blood vessels in their eyes, Dr. Finke stated, "I personally am not aware of that, but it could be possible." Defense counsel also asked Dr. Finke whether coughing, sneezing, or vomiting could burst a blood vessel in the eye, and he agreed that could happen. But on redirect, the State asked Dr. Finke if these types of activities would result in marks on the neck, and he responded, "No." During closing argument, the prosecutor's full commentary on Dr. Finke's testimony, without focusing solely on one statement in isolation, was as follows:

> He testified about his examination of her, and he said that based on everything, even looked at the video - - or the picture, which he said he didn't recall from that day, is consistent with a sexual assault and consistent with manual strangulation. But what he also said is, "You can't do that to yourself." Petechiae in the eye - - or on the forehead, excuse me, the redness in the eye, the throat, that takes pressure. That takes force. Defense even threw out a hypothetical to him about children holding their breath and breaking blood vessels in their eye. Doctor said, "No. That's not really it." But, again, that wouldn't cause a zip tie mark to your neck. That wouldn't cause marks to your wrists. So, again, it is consistent with what her version of events were that day.

A review of the prosecutor's statements as a whole, particularly considering the context of the underlying trial testimony, does not support Richard's contention that the State misrepresented Dr. Finke's testimony.

[¶28.]     Next, there is no merit to Richard's claim that the prosecutor used "deceptive innuendo" and "patently deliberate" deception when referring, during rebuttal, to letters found in Richard's desk at Bison Grain.  These writings appeared to have been written by Richard to J.S. prior to the incident at issue.  In them, Richard expressed sorrow and regret for his drinking and adultery.  He promised to change and proposed certain changes to save the relationship before either of them filed for divorce.  The prosecutor accurately noted that one letter contained a statement that the letter was written against his lawyer's advice.  It further expressed that despite his efforts as detailed in the letter, Richard knew he was losing the battle because J.S. had moved out and filed for divorce.  The prosecutor argued that this evidence showed Richard had a motive to perpetrate these acts upon J.S.  This was a fair argument in response to defense counsel's suggestion that J.S. either set up or exaggerated the whole incident in an attempt to extract a more favorable property settlement in the divorce.

[¶29.]     Richard's additional claims—that the State "knowingly presented misleading and potentially perjured testimony from" J.S. and from her divorce attorney—are likewise unfounded.[6]  Beyond appellate counsel's bald accusations, there is no evidence that the prosecution introduced perjured testimony by either J.S. or her divorce attorney.  Rather than outlining any prosecutorial misconduct, appellate counsel's critique of J.S.'s testimony is nothing more than a routine attack on a witness's credibility based on perceived inconsistencies in the evidence.

---

6.    Allegations of suborning perjury are indeed serious and should only be made when based on a firm foundation.  Appellate counsel's accusations here are disturbing, given their unfounded nature.

Moreover, the allegedly perjured testimony from J.S.'s divorce attorney was in fact *elicited by defense counsel.* Appellate counsel's argument further overlooks the fact that J.S.'s divorce attorney ultimately acknowledged that J.S. would not waive her right to bring a civil suit against Richard and that nothing prevented her "from filing a lawsuit tomorrow[.]"

[¶30.] Because Richard's prosecutorial misconduct claims are unfounded, he has failed to establish even the first prong of plain error.

### 3. Whether the circuit court erred in denying Richard's motion for judgment of acquittal.

[¶31.] Richard argues that the State failed to present sufficient evidence to support a conviction on each offense. In regard to the kidnapping conviction, he claims that the evidence is insufficient because the State only presented J.S.'s uncorroborated testimony that Richard took her from Bison Grain without her consent. Richard contends the evidence is similarly insufficient to prove aggravated assault because the State failed to present evidence corroborating J.S.'s account of the alleged assault, such as trace evidence of fecal or urine matter on the floor at Bison Grain. In regard to the rape conviction, Richard argues that no trier of fact could conclude beyond a reasonable doubt that he raped J.S. because the medical professionals did not find evidence of injuries to her vagina or anus; law enforcement did not find evidence of fibers on the bedroom or bathroom floor to support her statement that he cut off her clothing; and the marks on J.S.'s wrists and neck were not sufficiently probative to establish nonconsensual sex. Finally, Richard contends that J.S.'s uncorroborated testimony that he used a gun to commit the offenses was insufficient given her allegedly conflicting statements as to

whether she could describe the gun, and because no such gun was found during the investigation.

[¶32.] "We review a denial of a motion for judgment of acquittal de novo." *State v. Armstrong*, 2020 S.D. 6, ¶ 12, 939 N.W.2d 9, 12. "In measuring the sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83 (quoting *State v. Klaudt*, 2009 S.D. 71, ¶ 14, 772 N.W.2d 117, 122). It is well settled that we "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* Rather, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *State v. Jensen*, 2007 S.D. 76, ¶ 7, 737 N.W.2d 285, 288 (quoting *State v. Lewis*, 2005 S.D. 111, ¶ 8, 706 N.W.2d 252, 255). "Moreover, the jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Id.* (citations omitted).

### a. Kidnapping

[¶33.] The jury found Richard guilty of first-degree kidnapping in violation of SDCL 22-19-1(3), which defines this crime as follows:

> Any person who, either unlawfully removes another person from the other's place of residence or employment, or who unlawfully removes another person a substantial distance from the vicinity where the other was at the commencement of the removal, or who unlawfully confines another person for a substantial period of time, with any of the following purposes:
>  . . .
> (3) To inflict bodily injury on or to terrorize the victim or another
> . . . .

[¶34.]	A review of the record reveals sufficient evidence for the jury to conclude that Richard removed J.S. from Bison Grain for the purpose of inflicting bodily injury upon her or to terrorize her. J.S. testified in detail regarding Richard's act of forcefully removing her from Bison Grain. Further, Doug testified that Richard told him to leave for his lunch like he normally does when, according to Doug, he does not take lunch during the normal lunch hour. The jury could therefore infer that Richard ordered Doug to leave so he could be alone with J.S. to perpetrate these unlawful acts. J.S.'s testimony regarding the events that transpired later at the marital home further supports the jury's finding that Richard removed her from her place of employment to another location to injure or terrorize her.

### b. Aggravated Assault

[¶35.]	"Any person who . . . [a]ttempts to induce a fear of death or imminent serious bodily harm by impeding the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck, or by blocking the nose and mouth[ ] is guilty of aggravated assault." SDCL 22-18-1.1(8). Richard's argument on this charge centers on the State's failure to produce evidence corroborating J.S.'s claim that she urinated and defecated after Richard strangled her. Even though such evidence is not necessary to sustain the conviction, and the jury—not this Court—must evaluate the weight, if any, to give to the asserted lack of corroborating evidence, Richard's argument overlooks the fact that there was evidence corroborating many aspects of J.S.'s testimony. The jury heard testimony from law enforcement who found J.S.'s jeans and underwear in the dryer at the

marital home where the events had transpired. Several witnesses also described the ligature marks on J.S.'s neck as appearing consistent with the markings from a zip tie. These, along with the broken blood vessels on J.S.'s face and in her eye, supported the State's argument that Richard had placed a zip tie around J.S.'s neck and impeded her normal breathing to induce a fear of death or imminent serious bodily harm.

### c. Rape

[¶36.] The jury found Richard guilty of second-degree rape under SDCL 22-22-1(2), which provides that "[r]ape is an act of sexual penetration accomplished with any person under any of the following circumstances: . . . Through the use of force, coercion, or threats of immediate and great bodily harm against the victim or other persons within the victim's presence, accompanied by apparent power of execution[.]" Although Richard claims more evidence of injury or other corroboration was necessary to prove beyond a reasonable doubt that he raped J.S., on appeal, we will not set aside a jury verdict unless "the evidence and all reasonable inferences to be drawn therefrom fail to sustain a rational theory of guilt." *State v. Berhanu*, 2006 S.D. 94, ¶ 7, 724 N.W.2d 181, 183 (citation omitted). Moreover, when a conviction turns in large part upon the credibility of witnesses, a circuit court properly leaves "to the jury the pervasive issue of credibility and considering the evidence as a whole[.]" *State v. Guthrie*, 2001 S.D. 61, ¶ 50, 627 N.W.2d 401, 422.

[¶37.] Here, J.S.'s testimony alone, if believed by the jury, was sufficient to establish the elements of rape. But in addition, the jury heard testimony that law

enforcement located several items in the house consistent with her explanation of what had occurred there—pubic hairs in the bathroom, J.S.'s DNA on the razor, lubricant in the bedroom, the partial zip tie on top of the refrigerator, the bed linens in the washing machine, and J.S.'s jeans and undergarments in the dryer. Further, Nurse Schumacher testified that based on her observations during J.S.'s medical exam, J.S.'s vaginal and anal openings were very tender. This evidence is sufficient to support a finding of the elements of rape beyond a reasonable doubt.

### *d. Commission of a Felony with a Firearm*

[¶38.]     The jury convicted Richard of violating SDCL 22-14-12, which provides: "Any person who commits or attempts to commit any felony while armed with a firearm . . . is guilty of a Class 2 felony for the first conviction." Richard maintains that aside from J.S.'s testimony, "[t]here is no other evidence that the gun allegedly used even exists, except the bullets that were recovered at the residence." He further contends J.S. gave contradictory statements, raising questions as to the reliability of her description of the gun he allegedly used during the events in question.

[¶39.]     Contrary to Richard's suggestion, we do not reweigh evidence or pass on the credibility of witness testimony. *See Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d at 83. Like the other charges, the jury could reasonably have concluded based on J.S.'s testimony alone, wherein she described the gun and how it was used, that Richard used a gun while perpetrating the felonies at issue. The jury could also rely on the fact that law enforcement discovered bullets at the scene in the pocket of a pair of

Richard's jeans located in a clothes hamper, consistent with the type of bullet used in the gun described by J.S. (a .357 magnum revolver).

[¶40.] Because our review of the evidence in the light most favorable to the prosecution supports that the jury could have found the essential elements of the crimes beyond a reasonable doubt, the circuit court did not err in denying judgment of acquittal on all counts on which Richard was convicted.

### 4. *Whether cumulative error occurred, denying Richard of his right to a fair trial.*

[¶41.] Richard restates the errors alleged in the previous issues and claims that the cumulative effect of these errors denied him of his constitutional right to a fair trial. Because Richard has not established an error on any of the above issues, we need not address this argument. *State v. Hemminger*, 2017 S.D. 77, ¶ 41, 904 N.W.2d 746, 759 (declining to review a claim of cumulative error based on the Court finding a lack of error on the other issues raised).

### 5. *Whether Richard's sentence is grossly disproportionate in violation of the Eighth Amendment.*

[¶42.] Richard challenges the constitutionality of his sentence for multiple reasons. He claims that his 75-year sentence is grossly disproportionate because the circuit court, in effect, gave him a life sentence. He also contends that his 45-year sentence for kidnapping—nearly twice as long as that received for rape and aggravated assault—is grossly disproportionate because the court did not consider what he describes as the incidental nature of the kidnapping in the commission of his other crimes. Regarding his total sentence, Richard asserts that the "court effectively ignored all mitigating factors" and "summarily disregarded any and all

evidence of" his good character. Finally, in his view, the court erroneously inferred without evidentiary support that he executed his crimes with premeditation, and then used that erroneous determination to impose a severe sentence.

[¶43.]    There are generally two types of sentence challenges—an Eighth Amendment violation and an abuse of discretion. Although Richard characterizes his challenge to the circuit court's sentence as an Eighth Amendment claim and quotes our law governing proportionality review, his arguments only dispute the appropriateness of the court's particular sentence based on the facts of this case and Richard's unique characteristics. The State's brief likewise seems to conflate the two types of sentence challenges. The State first identifies our law governing proportionality review, but then—within that constitutional analysis—quotes language from *State v. Bonner*, 1998 S.D. 30, ¶ 19, 577 N.W.2d 575, 580, setting forth what a court is to consider in exercising its discretion when imposing a sentence. Because Richard characterized his sentencing challenge as an Eighth Amendment claim, we address that claim first, although we also review the sentence for an abuse of discretion.

### a. Eighth Amendment

[¶44.]    "In answering the threshold question of gross disproportionality" "the gravity of the offense refers to the offense's relative position on the spectrum of all criminality." *State v. Chipps*, 2016 S.D. 8, ¶ 35, 874 N.W.2d 475, 487. Similarly, an examination of the harshness of the penalty looks "to the penalty's relative position on the spectrum of all permitted punishments." *Id.* ¶ 37, 874 N.W.2d at 488. "This comparison rarely 'leads to an inference of gross disproportionality' and typically

marks the end of our review[.]" *Id.* ¶ 38, 874 N.W.2d at 489 (citation omitted). However, "[i]f the penalty imposed appears to be grossly disproportionate to the gravity of the offense, then we will compare the sentence to those 'imposed on other criminals in the same jurisdiction' as well as those 'imposed for commission of the same crime in other jurisdictions.'" *Id.* (quoting *Solem v. Helm*, 463 U.S. 277, 291, 103 S. Ct. 3001, 3010, 77 L. Ed. 2d 637 (1983)).

[¶45.]    Richard's attempt to minimize the gravity of his offenses ignores that the jury found him guilty of multiple acts: kidnapping J.S. to inflict bodily injury or to terrorize her; assaulting her by cutting off her oxygen supply; and raping her—all while armed with a gun. These crimes indisputably sit on the more serious end of the spectrum of all criminality and "often warrant severe penalties." *See, e.g.*, *State v. Traversie*, 2016 S.D. 19, ¶ 17, 877 N.W.2d 327, 332 (reviewing sentences for kidnapping and assault); *State v. Yeager*, 2019 S.D. 12, ¶ 6, 925 N.W.2d 105, 109 (explaining that "[r]ape is a heinous crime"). In regard to the harshness of the penalties imposed, Richard has not established that the circuit court violated his constitutional right to be free from cruel and unusual punishment. He faced a life sentence for the kidnapping conviction and received a 45-year sentence. He faced a maximum possible sentence of 50 years for the rape conviction and received a 25-year consecutive sentence. He faced a maximum possible sentence of 25 years for his conviction of commission of a felony with a firearm and received the mandatory minimum sentence of five consecutive years. His remaining sentence (15 years for aggravated assault) was ordered to run concurrent to the other sentences.

[¶46.]     When the gravity of the offenses is compared to the harshness of the penalties, Richard's sentences do not appear grossly disproportionate.  Because Richard has not met the threshold requirement of gross disproportionality, our review under the Eighth Amendment ends.

### b.  Abuse of Discretion

[¶47.]     "Before sentencing a defendant, the court is to 'acquire a thorough acquaintance with the character and history of the [person] before it.'"  *State v. Diaz*, 2016 S.D. 78, ¶ 47, 887 N.W.2d 751, 765 (alteration in original) (quoting *State v. Lemley*, 1996 S.D. 91, ¶ 12, 552 N.W.2d 409, 412).  In doing so, the court should consider the defendant's "'general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record[,]' as well as the rehabilitative prospects of the defendant."  *State v. Overbey*, 2010 S.D. 78, ¶ 36, 790 N.W.2d 35, 44 (quoting *State v. Blair*, 2006 S.D. 75, ¶ 27, 721 N.W.2d 55, 63).  On appeal, we will reverse a sentence upon a showing of an abuse of discretion—"a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable."  *State v. Holler*, 2020 S.D. 28, ¶ 10, 944 N.W.2d 339, 342 (citation omitted).

[¶48.]     Contrary to Richard's characterization of the circuit court's sentencing decision, the court carefully addressed each of the penological factors of retribution, deterrence, incapacitation, and rehabilitation.  In doing so, the court considered the mitigating factors, including his lack of criminal history, his contributions to his community, and the multitude of letters submitted in support of Richard.  The court

also considered that Richard had recently married, which suggested to the court that he is able to take on responsibility. However, "in the midst" of these mitigating factors, the court identified a common thread—attempts to justify why Richard did what he did. The court recounted one particular letter written in support of Richard explaining the combative and contentious nature of J.S. and Richard's relationship and alleging J.S. was the aggressor and someone with a goal to destroy Richard. In the court's view, even if both Richard and J.S. "had engaged in button-pushing in the past, no one deserves to be kidnapped, bound with zip ties around their neck, pass out, lose consciousness, urinate themselves, be thrown into the back of a pickup truck with the door slammed, only to have the pressure released so they can endure a brutal rape vaginally and anally upon being revived." The court noted that the many letters from the community in support of Richard failed to understand his "dual persona" and "Jekyll and Hyde" nature.

[¶49.] Ultimately, the court considered Richard's prospects for rehabilitation unlikely based on the heinous nature of the crimes in this case. The court also disagreed with the psychosexual assessment that Richard would be safe in the community in light of the calculation and deliberation required to perpetrate these crimes against J.S. After considering everything presented, including the testimony, presentence investigation report, psychosexual assessment, letters of support, victim impact statement, and considerations relevant to rehabilitation, the court imposed a "significant sentence." Based on our review of the record, the court did not abuse its discretion in imposing a total sentence of 75 years.

[¶50.] Affirmed.

#29182

[¶51.]     GILBERTSON, Chief Justice, and KERN, JENSEN, and SALTER, Justices, concur.