#30025-a-JMK
**2023 S.D. 30**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

          v.

ADNAN R. SHIBLY,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
LINCOLN COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE RACHEL R. RASMUSSEN
Judge

* * * *

JASON R. ADAMS of
Tschetter & Adams Law Office, P.C.
Sioux Falls, South Dakota                 Attorneys for appellant.


MARTY J. JACKLEY
Attorney General

JOHN M. STROHMAN
Assistant Attorney General
Pierre, South Dakota                      Attorneys for appellee.

* * * *

CONSIDERED ON BRIEFS
MAY 23, 2023
OPINION FILED **06/28/23**

#30025

KERN, Justice

[¶1.]     Adnan Shibly was charged with seven counts of violating a no contact order. While the alleged victim, Irina Manuylo, was testifying at Shibly's jury trial, she became emotional in front of the jury causing the circuit court to recess the jury during her testimony. The court ordered Manuylo not to communicate with anyone during the recess. In violation of this order, Manuylo spoke with her mother. Shibly moved for a mistrial, which was denied after the court questioned Manuylo about the content of the conversation and determined she had not spoken with her mother about the case. Manuylo returned to the stand but became emotional again, and the court recessed the trial for the day after Manuylo told the court she did not feel well. Shibly again moved for a mistrial, which the court held in abeyance until trial reconvened the following morning. After a hearing, the court denied the motion but gave the jury a curative instruction. At the close of the evidence, Shibly moved for a judgment of acquittal alleging insufficiency of the evidence. The court denied the motion, and the jury convicted Shibly on all counts. Shibly appeals, asserting the circuit court erred by denying his motions for mistrial and judgment of acquittal. We affirm.

**Facts and Procedural History**

[¶2.]     Shibly and Manuylo were in a long term "on and off" again romantic relationship but were not residing together at the time of the incident. During their ten-year relationship, they had three children together. A no contact order was issued against Shibly on November 30, 2020, as a condition of bond in a separate criminal case. The order required Shibly to have no contact with Manuylo.

-1-

[¶3.] Manuylo called law enforcement on the evening of March 9, 2021, and reported a family dispute. She told law enforcement that Shibly made multiple phone calls and sent text messages to her from his phone number and from other numbers. He also came to her front door and appeared angry, knocking hard on the door for her to let him in. She refused to do so. As a result of this incident, the State filed a seven count information, charging Shibly with one felony violation of a no contact order by stalking (domestic), in violation of SDCL 25-10-13 and SDCL 22-19A-1, and six misdemeanor counts of violation of a no contact order (domestic), in violation of SDCL 25-10-13.

[¶4.] A two-day trial was held on October 26–27, 2021. On the first day of trial, the State called Manuylo to the witness stand. After answering a few introductory questions, Manuylo became evasive, stating that she did not recall calling law enforcement on the date in question and did not remember that Shibly was ordered not to have contact with her. Manuylo stated she had a bad memory. The following colloquy occurred:

| | |
|---|---|
| State: | Do you remember - - let me ask you this: Do you have a cell phone? |
| Manuylo: | Right now honestly, um . . . |
| State: | Did you have a cell phone back in March? Irina, did you have a cell phone back in March? |
| Manuylo: | I told you I can't do this. |
| State: | I'm asking did you have a cell phone, yes or no? |
| Manuylo: | I don't know. |
| State: | Why don't you know? |
| Manuylo: | You guys have hurt me more in the past year than he has. |
| State: | What was that? |
| Manuylo: | Can I leave? |
| State: | No. |

At that point, the State asked for a short break and the court excused the jury after providing the standard recess admonishment.

[¶5.] The State requested that the court declare Manuylo to be an unavailable witness under the exception set forth in SDCL 19-19-804(b)(6), which permits hearsay when "[a] statement [is] offered against a party that wrongfully caused--or acquiesced in wrongfully causing--the declarant's unavailability as a witness, and did so intending that result." The State asserted that several members of Shibly's family, who were seated directly behind him in the courtroom, had been in frequent contact with Manuylo encouraging her not to show up at trial. The State indicated that Manuylo had been concerned about testifying in front of the family members, fearing that they would retaliate against her if she testified against him. Further, the State claimed that Shibly had attempted to call Manuylo multiple times from the jail in the preceding months.

[¶6.] Before ruling on the motion, the court took a short recess. The court advised that because Manuylo was still under oath, it was not "appropriate for anyone to talk to her at this point" and left an officer in the courtroom to make sure that no one tried to talk to Manuylo during the recess.

[¶7.] Upon returning from the recess, the court had a discussion with Manuylo, who ultimately agreed to follow the court's order to testify and answer questions to the best of her ability. The court, therefore, declined to deem Manuylo unavailable. However, before the jury was brought back to the courtroom, counsel for Shibly informed the court that Manuylo had talked to her mother during the recess, contrary to the court's instructions, and Shibly made a motion for a mistrial.

The court questioned Manuylo, who acknowledged speaking with her mother during the recess, explaining that her mother had given her some valerian oil to help her calm down. She stated that she did not discuss her testimony with her mother, who had not been present for Manuylo's testimony. The court, noting that neither side expected to call Manuylo's mother as a witness, denied the motion for mistrial, concluding that there was not "enough prejudice to grant a mistrial in this case under that circumstance."

[¶8.]     Manuylo then informed the court that she was not feeling well, but the court decided to proceed with the trial based on concerns about the court's ability to enforce the sequestration order. The jury was brought back into the courtroom, and the State continued its direct examination of Manuylo.

[¶9.]     The State asked whether Shibly had come to her house on March 9, 2021, but she did not respond definitively. She did express that Shibly had called her repeatedly, both from phone numbers that she recognized and from numbers she did not recognize. She acknowledged that the court had ordered Shibly not to contact her, yet he called her more than ten times. She testified that she showed the responding officer her phone and he took pictures of the screens depicting the texts and calls she had received. She also told the officer that she had answered some of the calls and recognized the caller as Shibly. The State then asked:

> State:     Do you want the defendant to be calling you over and over and over again?
> Manuylo:   That night, no.
> State:     Did you want it to stop?
> Manuylo:   That day, yeah.  I wasn't feeling good.
> State:     Did it stop?
> Manuylo:   No.

Manuylo acknowledged that Shibly was upset with her because she was not answering her phone but stated that there had been times when she had called him over and over as well.

[¶10.]     The State then began showing Manuylo photographic exhibits numbered 2–17 depicting screen shots from her phone, when the following discussion occurred:

> Manuylo:     I can't do this.  You keep putting me through this crap.  Take my kids from me and everyone else.  I can't do this.
>
> Court:     Ms. Manuylo, I'm going to instruct you to only answer and speak when answering questions.
>
> Manuylo:     I can't do this, Your Honor.  I can't do this.
>
> Court:     Ms. Manuylo, please sit back down.
>
> Manuylo:     Take me to jail.  I can't do this.
>
> Lt. Knutson: Just have a seat, okay?
>
> Manuylo:     I'm not going to answer any more questions from her.  No, I can't.  You don't know how I feel.

Manuylo left the witness stand and sat in the front bench of the gallery.  At this point, the court excused the jury without further instruction.

[¶11.]     Manuylo told the court that she would not return to the witness stand and that she did not feel well.  She told the court that if she felt better in the morning, she would be willing to testify then.  The court decided to recess for the day.  Shibly renewed his motion for a mistrial based on the conduct and statements that had occurred in front of the jury.  The court took the motion under advisement until the following day and reminded the parties that the sequestration order was

in effect and that any person who might attempt to improperly contact Manuylo could be charged with witness tampering.[1]

[¶12.]        The next morning, the defense argued that Shibly was prejudiced by Manuylo's actions to such an extent that even a curative instruction could not correct it.  After considering the arguments of the parties, the court denied the motion for a mistrial but indicated it would give the jury a special instruction. When the jury returned to the courtroom, the court stated the following:

> . . . I would like to instruct the jury a bit further.  Yesterday we ended in a non-typical manner, and I would note that any comments that were nonresponsive to a question being asked by the State to the witness just before and after she left the witness stand will be struck from the record.  In addition, any conduct should be disregarded and not considered in deliberations.
>
> I do have an instruction specifically to read to you.  It is your duty as a juror to determine the facts, and you must do this from the evidence that has been produced here in open court.  Any statements made by a witness that the [c]ourt has ordered stricken should not be considered by you as evidence in this case.  Any conduct the [c]ourt has told you to disregard should not be considered as evidence in this case.  You must not - - you

---

1.        Before concluding the proceedings, the court indicated that in light of the nature of the charges, it had concerns about the "demeanor of some of the individuals sitting behind the defendant throughout the course of the trial today.  I have grave concerns about contact.  And quite honestly, Ms. Manuylo's safety."  The court ordered that Shibly have no contact with anyone other than his attorney until the trial resumed in the morning.

The following day, prior to trial, the State reported that after these proceedings, as the trial participants and audience members were leaving for the day, several of Shibly's family members approached Manuylo's mother near her car and words were exchanged between the family members and a deputy state's attorney who tried to stop the interaction.  Portions of this interaction were apparently captured by a security camera, but the video is not contained in the record.  In response to this assertion, the court individually canvassed the members of the jury and none reported seeing or hearing any interaction connected to the proceedings as they were leaving the building the previous day.

must put any such statement and conduct out of your mind and not consider them in any way in your deliberations in this matter.[2]

[¶13.] Manuylo then returned to the stand, and her direct examination continued. The State offered several exhibits showing missed and answered calls to Manuylo's phone on the evening of March 9, 2021, including missed calls at 7:10, 7:55, 10:38, 10:46, 10:48, 10:49, 10:52, 10:53, 10:56, 10:57, and two calls at 10:58. There were also several calls that Manuylo answered. There was a call at 9:33 that was nine minutes long, a call at 9:43 that was 19 seconds long, a call at 9:44 that was 52 seconds long, a call at 10:37 that was ten seconds long, a call at 10:38 that was eight seconds long, and a call at 10:55 that was 19 seconds long. Many of the phone calls were from the same number, which Manuylo indicated was a number she knew to be Shibly's, but several were from other numbers. She stated that Shibly was on the line when she answered several of the calls. The State also introduced a series of text messages sent at 10:38, which it theorized were sent by Shibly, reading:

> De yalla I'll see you soon
>
> You got bunch of graghead in the house
>
> [two emojis with a single tear; one emoji with streaming tears]
>
> De yalla just like always when you got people over you don't know me .im always last thing on your mind good night …
>
> I always send you money when you ask .i do nothing but love you and be there for you

---

2.      This instruction was also included in the final instructions to the jury.

[¶14.]    Manuylo then testified that Shibly came to her house that night and knocked hard on her door, but she did not let him in. On cross-examination, Manuylo stated that Shibly was angry when he was outside, but he did not threaten her. Manuylo further stated that of the calls she answered, she knew it was Shibly because she had spoken with him. Regarding the unanswered calls, she testified that she did not know if he placed the calls or if someone else did. The same was true of the text messages. She acknowledged that she wanted Shibly to stop calling her because she was tired and did not feel well.

[¶15.]    The State also called Officer Jeff Rech, who testified that he was dispatched to Manuylo's residence for a family dispute to investigate a no contact order violation. He stated that there was a no contact order in place between Shibly and Manuylo. He said that when he got to Manuylo's residence, she told him Shibly had been at her door and that he had made numerous phone calls to her. There were multiple calls made to Manuylo's phone while Officer Rech was at her residence, one of which she answered in his presence. He testified he could hear a man's voice speaking to Manuylo at times in a foreign language. Officer Rech also stated that Manuylo was receiving calls from various phone numbers. Manuylo believed they were being sent to her through the use of a random phone number generator because Shibly had used this technology in the past.

[¶16.]    Officer Rech also testified that he obtained Shibly's number from Manuylo. As part of his investigation, he called the number and a man answered, identifying himself as Shibly. When asked why he was contacting Manuylo, Shibly gave Officer Rech several stories regarding the calls. He indicated that Manuylo

had stolen his phone several days earlier and that she and a man named Andrew made the calls and sent the texts. Shibly told Officer Rech that Andrew had then dropped the phone off with him at the shop he was staying at around 11:00 that night. When Officer Rech confronted Shibly with the timing discrepancies and the fact that he was with Manuylo when she received some of the calls, Shibly contended that he was telling Andrew what to say to Manuylo in order to relay a message to her.

[¶17.] The State's final witness was Krista Heeren-Graber, the executive director of the South Dakota Network Against Family Violence and Sexual Assault. As a licensed social worker, with many years of experience working with victims of domestic abuse, she testified regarding the techniques a person may use to maintain control of a victim including emotional, physical, and economic abuse. She also testified about some of the characteristics of victims of domestic violence including their tendency to blame themselves for the abuse to avoid getting the abuser in trouble. She described victims' hesitancy to cooperate with law enforcement and their tendency to minimize or recant their statements because they have been intimidated or are fearful. Heeren-Graber also described the power and control cycle of violence beginning with a tension building phase, leading to an abusive act, followed by a period of reconciliation or a "honeymoon" phase. During the "honeymoon" phase, Heeren-Graber explained that the offender may apologize, give gifts, and make promises leading the victim to be hopeful that things will change for the better. On cross-examination, Heeren-Graber acknowledged that she

had no specific information about Shibly or Manuylo and had no information regarding their case.

[¶18.]     After its last witness, the State asked the court to take judicial notice of the no contact order, and it was admitted into evidence. The State then rested its case. Shibly moved for a judgment of acquittal on all counts but focused on the felony count, arguing that the State had failed to provide evidence that the contacts from Shibly were malicious in nature. The court denied the motion. The defense did not present any witnesses.

[¶19.]     The jury convicted Shibly on all seven counts. He was sentenced on the one felony count to two years in the state penitentiary, all suspended, with credit for time served and payment of fines, fees, and costs. No sentence was imposed on the misdemeanor counts two through seven.

[¶20.]     Shibly appeals, raising two issues we restate as follows:

1.     Whether the circuit court abused its discretion by denying Shibly's motion for mistrial.

2.     Whether the circuit court erred by denying Shibly's motion for judgment of acquittal on the charge of felony violation of a no contact order by stalking.[3]

### Analysis

### 1.     *Whether the circuit court abused its discretion by denying Shibly's motion for mistrial.*

[¶21.]     "We review the denial of a motion for mistrial for an abuse of discretion[.]" *State v. Nelson*, 2022 S.D. 12, ¶ 35, 970 N.W.2d 814, 826 (alteration in original) (quoting *State v. Taylor*, 2020 S.D. 48, ¶ 41, 948 N.W.2d 342, 355). "An

---

3.     On appeal, Shibly challenges the sufficiency of the evidence for only the felony charge.

abuse of discretion is 'a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable.'" *Id.* (quoting *State v. Kvasnicka*, 2013 S.D. 25, ¶ 17, 829 N.W.2d 123, 127–28). "For purposes of determining whether there are grounds for a mistrial there must be error 'which, in all probability, produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it.'" *Id.* (quoting *State v. Stone*, 2019 S.D. 18, ¶ 34, 925 N.W.2d 488, 500).

[¶22.] Here, Shibly argues that a mistrial should have been granted at two points during the trial. First, Shibly argues the court erred by denying his motion for mistrial when Manuylo violated the circuit court's order not to talk with anyone during the recess. Second, Shibly contends he was entitled to a mistrial after Manuylo left the witness stand to sit in the gallery after stating, "I can't do this" and "take me to jail."

[¶23.] Regarding the first motion for mistrial, the court queried Manuylo about whether she discussed her testimony with her mother. Manuylo stated that her mother had given her some oil to help her calm down and that she did not discuss the case with her mother. In denying the motion, the court noted that Manuylo and her mother were supervised by a courtroom security officer while they were sitting together and that they did not communicate in a foreign language. Additionally, Manuylo's mother was not a witness in the case. Based on our review of the record, there is no evidence that Manuylo's testimony was impacted by any discussion that occurred with her mother during the recess. The court did not abuse its discretion in denying this motion for a mistrial.

[¶24.]     Shibly argues that the court erred in denying his second motion for a mistrial because the cumulative effect of Manuylo's "unsolicited statements and outbursts," along with her violation of the court's order not to communicate with anyone during the recess resulted in prejudice that deprived him of a fair trial. In Shibly's view, the curative instruction was inadequate to remediate the prejudice to him because the jury could infer that he was coercing Manuylo not to testify. Shibly points out that the circuit court acknowledged that the jury could have inferred that he was threatening Manuylo, which reinforces his assertion that Manuylo's conduct resulted in sufficient prejudice to his case to warrant a mistrial.

[¶25.]     After the second disruption during Manuylo's direct examination, the court dismissed the jury for the day. Shibly moved for a mistrial, which the court took under advisement overnight. The parties reconvened outside the presence of the jury the following morning. In ruling on Shibly's motion, the court described the events of the preceding day. The court observed that Manuylo was "extremely soft spoken and emotional" during her testimony on the stand, which demeanor the court found "very common" for witnesses who were alleged victims. The court concluded that the "spontaneous statements" would not warrant a mistrial and were not "completely abnormal, [e]specially in these types of situations and this type of case."

[¶26.]     The court then addressed whether the statements coupled with Manuylo's decision to leave the witness stand was prejudicial to Shibly. The court considered the prejudice to both sides, noting that the jurors could infer that the State was forcing Manuylo to testify. The court also found it equally possible that

"[t]he jury could infer that defendant was threatening her, coercing her not to testify" or could "infer that she's not credible and that her story is changing." The court noted that it struck the objectionable testimony through a curative instruction and had given a preliminary instruction advising the jury to disregard any testimony it ordered stricken. Therefore, the court denied the motion for mistrial concluding there was no showing of actual prejudice to the defense.

[¶27.] Typically, "[w]e 'presume that juries understand and abide by curative instructions.'" *Nelson*, 2022 S.D. 12, ¶ 41, 970 N.W.2d at 827–28 (quoting *State v. Dillon*, 2010 S.D. 72, ¶ 28, 788 N.W.2d 360, 369). This is not a case where it is apparent from the record that the jury was unable to follow the instruction from the court, and there is no showing that Shibly was deprived of a fair trial. The instruction was clear regarding the statements and conduct that the jury should not consider. After the curative instruction was given, Manuylo resumed the stand, completed her direct examination, and was subject to cross-examination.

[¶28.] While Manuylo's episodes may have presented certain challenges during the trial, our review of the "cold record invariably lacks the emotion of the occurrence below" to which the circuit court is privy. *State v. Perovich*, 2001 S.D. 96, ¶ 24, 632 N.W.2d 12, 17. In *Perovich*, this Court upheld the denial of a motion for a mistrial after the young victim in a child rape case entered the courtroom after being called to testify but then remained in the back of the courtroom crying for five to six minutes. *Id.* ¶ 21. After taking the witness stand to testify, the child continued crying while holding a stuffed bear. *Id.* We held that "[w]hether or not

these emotions amount to circumstances that create an unfair trial is best addressed within the discretion of the trial court." *Id.* ¶ 24, 632 N.W.2d at 17–18.

[¶29.] The same reasoning is applicable here. The circuit court was in the best position to judge the emotionality of the situation and gauge the risk of prejudice resulting from the cumulative acts of the witness. Based on our review of the record, it is apparent that the circuit court did just that—carefully evaluated the facts and circumstances surrounding Manuylo's conduct and its effect on the jury. The circuit court determined that the conduct did not impact Shibly's substantial right to a fair trial. We conclude that the court did not abuse its discretion in denying Shibly's motion for mistrial.

> **2. Whether the circuit court erred by denying Shibly's motion for judgment of acquittal on the charge of felony violation of a no contact order by stalking.**

[¶30.] Shibly next asserts that there was insufficient evidence for a jury to find him guilty of the felony count of violating a no contact order by stalking (domestic). "We review a denial of a motion for judgment of acquittal de novo." *State v. Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d 301, 313 (quoting *State v. Armstrong*, 2020 S.D. 6, ¶ 12, 939 N.W.2d 9, 12). "[A] motion for a judgment of acquittal attacks the sufficiency of the evidence[.]" *State v. Peneaux*, 2023 S.D. 15, ¶ 24, 988 N.W.2d 263, 269 (alterations in original) (quoting *State v. Timmons*, 2022 S.D. 28, ¶ 14, 974 N.W.2d 881, 887). "In measuring the sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d at 313

(quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83).  In doing so, this Court "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence."  *Id.*  We must "accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Id.* (quoting *State v. Jensen*, 2007 S.D. 76, ¶ 7, 737 N.W.2d 285, 288).

[¶31.]      SDCL 25-10-13 provides that if a no contact order is issued and the person restrained knows of the order, a violation of the order is a Class 1 misdemeanor.  However, if the violation also constitutes stalking as criminalized in SDCL 22-19A-1, then the violation becomes a Class 6 felony.  SDCL 25-10-13.  The statute criminalizing stalking provides in relevant part that "[n]o person may: . . . (3) Willfully, maliciously, and repeatedly harass another person by means of any verbal, electronic, digital media, mechanical, telegraphic, or written communication."  SDCL 22-19A-1.  "Malice" is defined in SDCL 22-1-2 as "a wish to intentionally vex, annoy, or injure another person, established either by proof or presumption of law[.]"[4]  Shibly concedes that there was evidence presented at trial that his contact with Manuylo was willful and repeated but argues that "[t]here is nothing in the record to support a finding that his actions were malicious or harassing to the extent in which it did not serve a legitimate purpose."  In his view, his purpose in contacting her was legitimate—he wanted to spend time with her because "they had an on-again/off-again relationship."

---

4.    "Malice" was defined in the jury instructions as "a wish to intentionally vex, annoy, or injure another person as established either by direct evidence or by an inference thereof that may be reasonably drawn from facts and circumstances shown."

[¶32.] However, after reviewing the evidence in the light most favorable to the jury's verdict, we conclude that there is sufficient evidence to support the verdict. Manuylo testified that Shibly was "angry" when he was at her residence, knocking hard on the door, and that she wanted him to stop calling her. There were eighteen calls to Manuylo's phone on the evening in question, including thirteen within the span of about twenty minutes. The repeated nature of the unwanted calls, his arrival at her residence to pound on the door, and the texts are evidence that Shibly intended to vex or annoy Manuylo, constituting malice.

[¶33.] We acknowledge that the conduct here differs from some of the malicious conduct described in other decisions. *See White v. Bain*, 2008 S.D. 52, ¶ 13, 752 N.W.2d 203, 207 (involving a series of offensive and insulting letters along with an uninvited entrance into a home); *Schaefer ex rel. S.S. v. Liechti*, 2006 S.D. 19, ¶ 17, 711 N.W.2d 257, 263 (involving the respondent "canvassing" children, watching children with binoculars, confronting and chasing children, and filing false complaints); *Erickson v. Earley*, 2016 S.D. 37, ¶ 13, 878 N.W.2d 631, 634 (involving pulling up beside the petitioner and calling his place of business while shouting profanities and indicating that people were "coming for" him). But this is simply a consequence of the statutory breadth of the definition of malice which convers conduct ranging from a wish to annoy another to a wish to injure. Suffice it to say that on this record, there was sufficient evidence for a jury to determine that Shibly acted with malice. The circuit court did not err in denying Shibly's motion for judgment of acquittal.

[¶34.] We affirm.

#30025

[¶35.] JENSEN, Chief Justice, and SALTER, DEVANEY, and MYREN, Justices, concur.