#30484-a-PJD
**2024 S.D. 56**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

v.

JOSHUA ROSE,                              Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE CRAIG A. PFEIFLE
Retired Judge

* * * *

MATTHEW MIRABELLA of
Pennington County Public
    Defender's Office
Rapid City, South Dakota                  Attorneys for defendant and
                                          appellant.


MARTY J. JACKLEY
Attorney General

STEPHEN G. GEMAR
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                          appellee.

* * * *

CONSIDERED ON BRIEFS
JUNE 4, 2024
OPINION FILED **09/11/24**

#30484

DEVANEY, Justice

[¶1.]        Joshua Jay Rose was charged with simple assault of his son C.R. and tried before a jury in magistrate court.  After the jury advised the court it was deadlocked, the court granted Rose's motion for a mistrial.  During a second jury trial, the State moved for a mistrial based on matters occurring during the cross-examination of C.R., namely, references to the previous trial in violation of a motion in limine, mention of a no-contact order between Rose and C.R., and questions about how the result of Rose's trial could affect where C.R. lived.  The magistrate court granted the mistrial, explaining it was necessitated by the cumulative effect of all three matters.  Prior to the commencement of a third trial, Rose moved to dismiss the charges against him based on double jeopardy.  The magistrate court denied the motion.  Rose was tried a third time, after which a jury found him guilty of simple assault.  Rose appealed his conviction to the circuit court, claiming the magistrate court abused its discretion in denying his motion to dismiss after the second mistrial.  The circuit court affirmed.  Rose now appeals to this Court, arguing the magistrate court abused its discretion by granting the second mistrial and by concluding double jeopardy did not preclude the State from retrying him. We affirm.

**Factual and Procedural Background**

[¶2.]        On January 14, 2019, Rose discovered that his son C.R., who was then eight years old, had not done his chores and had been watching television or playing video games despite being grounded from those activities.  While having a conversation with C.R. about this and other behavioral issues C.R. was having at

school, Rose struck C.R. on or near his ear. The next day, a classmate of C.R. noticed a bruise in and around C.R.'s ear and informed a teacher, who reported it to the principal. The school's counselor then spoke with C.R. and after observing marks on C.R.'s cheek and ear, the counselor contacted the school resource deputy, Jayson Herra. Herra also noted a large bruise on C.R.'s ear and a red mark on his cheek. Herra investigated, asking both C.R. and Rose what occurred, and Rose admitted that he had "bopped" C.R. on both ears with open palms. Rose was arrested and charged with simple assault.

[¶3.]    At the time of the incident and for six years prior, C.R. had been living with Rose in Box Elder, South Dakota, pursuant to an agreement between C.R.'s parents. After Rose's arrest, C.R. went to live with his mother in Missouri.

[¶4.]    Rose was charged with two alternative counts of simple assault, and on January 16, 2019, a no-contact order was entered as a condition of his bond, precluding Rose from having contact with C.R. The charges were tried before a jury during a one-day trial in magistrate court on October 3, 2019. In addition to Rose and C.R., several other witnesses testified regarding the events reported by C.R., including school counselor, Chandra Canaan; Rose's fiancé, Dani Stayton; social worker, Devann Pond; and school resource deputy, Jayson Herra.

[¶5.]    C.R. testified about the events in question. He also testified that in the nine months he had not seen his father, he "kind of" missed him. While being cross-examined about the reasons he was in trouble with his father that night, C.R. admitted that he lied to his father about having done his chores and that he lies "all of the time," although he knows the difference between the truth and a lie.

[¶6.]     Stayton, who was present during the conversation between Rose and C.R. that led to the alleged assault, also testified about her recollection of these events. The no-contact order (the mention of which later became an issue at the second trial) was mentioned during Stayton's testimony when Rose's counsel asked her if she was "aware there's a no contact order in this case." The State did not object to the question and Stayton answered, "yes."

[¶7.]     Rose testified that on the night he struck C.R., he and C.R. were discussing something that transpired at school that day. Rose explained that during that conversation, C.R. was not making eye contact with him, so he "bopped him on his ears to get his attention." According to Rose, C.R. did not cry and Rose did not see any bruising on C.R.'s face or ears that night.

[¶8.]     After the case was submitted to the jury, deliberations ensued for approximately 7 hours. At that time, the foreperson informed the magistrate court the jury was deadlocked and stated that additional time to deliberate would not assist them in reaching a unanimous verdict. Rose moved for a mistrial and the State did not oppose this request. The magistrate court granted the motion.

[¶9.]     A second trial was scheduled for July 1 and 2, 2021. Prior to trial, the State filed a motion in limine to preclude any reference to the first jury trial, which the magistrate court granted. C.R. again testified at trial and on cross-examination, defense counsel asked C.R. if he remembered testifying previously. When doing so, counsel asked:

Q: Okay. It's a little different experience today, isn't it?

A: Yeah.

Q: The jury is in a different spot?

A: Yeah. And it's a lot bigger room.

The State objected and a bench conference occurred. The record does not contain a ruling on the objection. At another point during cross-examination, defense counsel asked C.R.: "And you do remember testifying previously. Is that [r]ight?" C.R. responded: "Yes. But it became -- it was a mis-jury thingy. I don't remember what it's called. . . . It was a hanged jury." The prosecutor then asked to approach the bench, but the court stated that was not necessary and then instructed the jury to "disregard the statement just made by the witness."

[¶10.] On the topic of where C.R. was currently residing and his continued lack of contact with his father, C.R. testified during cross-examination that he had been living with his mother for the last two and a half years. He stated he no longer missed his father and liked living with his mother in Missouri. C.R. further testified he had talked to his mother about what happened during the incident for which his father was charged. Also on this topic, the following exchange between defense counsel and C.R. occurred:

Q: And you haven't seen your dad really since all this occurred, have you?

A: Yeah.

Q: And do you know why you haven't seen your dad?

A: Because there is a no-contact order in place.

STATE: Objection, Your Honor.

THE COURT: I'm going to sustain that. You are to disregard that response.

Q: You know that it's not your dad's choice not to speak to you or see you?

STATE: Objection, Your Honor.

THE COURT: The objection is sustained. You should disregard both the question and the answer.

[¶11.]     The questions precipitating the motion for a mistrial occurred later in C.R.'s cross-examination during the following exchange:

Q: And, [C.R.], you've talked to your mom quite a bit about coming and testifying here?

A: Uh-huh.

Q: And you know that what you say -- whether your dad is convicted can impact where you live?

STATE: Objection, Your Honor.

THE COURT: That is sustained. You will strike that and not consider the question.

Q: Do you know whether the results of this case –

STATE: Objection.

THE COURT: Sustained. Please move on.

[¶12.]     Defense counsel then asked to approach the bench and an off-the-record discussion occurred between the court and counsel. Defense counsel thereafter proceeded as follows:

Q: [C.R.], have you been told that what happens in court here will affect where you live?

STATE: I'm going to object, Your Honor, relevance.

THE COURT: Overruled. You may answer.

A: Uh, ye -- no.

Q: Why did you pause?

A: Because I forgot for a moment, and I remembered.

Q: So your mom has never talked to you about that?

A: Uh-uh.

[¶13.] During a subsequent break and outside the presence of the jury, the court and parties discussed the objectionable questions and answers that had been presented to the jury:

> THE COURT: There were several mentions regarding prior jury, the first -- I got a little angry with [defense counsel], and she did apologize during the sidebar. I don't think it was intentional. But [defense counsel] did bring up a jury elsewhere, and she caught herself almost immediately. But during that line of questioning, also, it did elicit answers from the witness to include the jury and, I believe, a hung jury.
>
> DEFENSE: May I just say? I did not solicit those answers.
>
> THE COURT: I don't mean you -- I don't think you intended, but the questions, the way you phrased them when you were talking about the prior testimony, that's what he was responding to.
>
> DEFENSE: Yes.
>
> THE COURT: And, I'm sorry. I didn't mean to suggest that you wanted him to say that. I don't believe that was your intention. And that -- the comments about the jury was sitting elsewhere is a violation of that motion in limine. I don't think it was an intentional violation. What is the State's position?
>
> STATE: Your Honor, at this time the State is going to make a motion for a mistrial, based on not only the comment by [defense counsel] that the Jury was sitting in another area. The State on that would agree with the Court. I don't believe it was intentional. But between that and the comments from [C.R.] that there was a hung jury, it's clear that this Jury now knows there was a previous jury trial; that that jury was unable to come to a decision.

Further, I think there were also several other violations, including the mention of the no-contact order; that this is not Joshua's choice to not be seeing [C.R.]. And there were at least two questions that solicited answers though they were sustained before the answers that there would be consequences if Mr. Rose was convicted here.

I think that with all of that information at this point the State does not -- the State no longer has access to a fair trial in this case. We would ask for a mistrial.

[¶14.] Defense counsel objected to the motion for mistrial, noting that C.R.'s statements about the prior mistrial were not solicited. Counsel also argued that the fact Rose had not seen his son for two and a half years because of the no-contact order was admissible. Counsel asserted that this context was important to explain how long the child had been in the exclusive care of his mother, a person with whom he had admittedly discussed his testimony about his father's alleged assault.

[¶15.] In response, the State maintained that eliciting the fact there was a no-contact order was inappropriate and prejudiced the State. The State also asserted that the last set of questions about the result of the trial impacting where C.R. would live was the most problematic. The magistrate court agreed:

THE COURT: And that is, quite frankly, the Court's concern, putting the consequences of a conviction on a child witness and asking that child witness to explain it, which is highly inappropriate, and I'm trying to determine whether I should grant the mistrial based off of that.

I think that based on the comments regarding the Jury sitting elsewhere, we can remedy that with a limine instruction. I started to draft that. I am very concerned about the question about not seeing his father. . . .

[¶16.]     Defense counsel then further explained the reasoning behind the question pertaining to whether C.R. knew that a conviction of his father would affect where he lives:

> DEFENSE: Because that goes directly to, if he said yes or no; he said yes, how does he know that? Who told him that?
>
> It's not actually w[h]ether or not it's true; it's whether somebody has been influencing him and telling him, if we don't get a conviction here, son, you're not going to be able to live with me any longer.

Defense counsel maintained such evidence regarding what may be motivating C.R.'s testimony was "extremely relevant" when assessing his credibility.

[¶17.]     However, the State contended this testimony was irrelevant because, in its view, C.R. had given "fairly consistent" answers when relating the "elements of the case" at various stages of the proceeding. The State further explained why it viewed this exchange as improperly commenting on the consequences of a conviction:

> STATE: The issue of consequence in a criminal trial, I think, in the mind of lay witnesses, of jurors is punishment. We discussed that in voir dire. At no point did we even try to discuss the issue of whether custody might be hinging on this. That has now been placed in front of the Jury, and that's a bell that can't be un-rung even though the question was sustained.

[¶18.]     The magistrate court then took a recess and after considering the matter further, the court granted the mistrial, explaining:

> The State has made a motion for a mistrial, alleging several reasons, the grounds being mentioned by defense counsel, . . . regarding a prior jury trial through -- indicating a jury sitting elsewhere through the mention of a no-contact order[ ] and the consequences of conviction when asking questions of the child of the defendant.

The defense clearly is objecting to that motion for the mistrial. The Court looked into whether there were other remedies available regarding the mention of the jury -- prior jury trial, stating that a limine instruction is appropriate and could remedy that, although I am concerned about several statements made by [C.R.], specifically the hung jury. And I do have concern about that, that a limine instruction might alleviate that. I don't believe [defense counsel] asked the question intending to get that result, but that was the result.

The Court is significantly concerned about the questioning of [C.R.] regarding consequences of conviction and the facts that are the decision by this Jury today or tomorrow could result in a change of permanent custody. That was not addressed in jury selection. That was not inquired of. I do not believe there is any sort of limine instruction that could un-ring that bell. I am angry that I have to do this, but I am granting the State's motion for a mistrial.

[¶19.] After the mistrial, a third trial was scheduled, but before it commenced, Rose filed a motion to dismiss the charges against him based on double jeopardy, which the State opposed. The magistrate court denied the motion to dismiss, making several findings on the record to clarify the basis for its ruling:

[L]et it be clear the manifest necessity that the State showed was in a series of three concerning moments during cross-examination of the alleged victim in this case. First, the defense counsel violating a motion in limine. Second, the defense counsel asking a question that solicited a response regarding no contact order and third and most concerning to the Court the defense counsel telling the victim that whether Mr. Rose is convicted impacts where he lives and then following that by a question of whether he knew the results of the case could affect custody. . . .

The motion in limine regarding mentioning a trial was very clearly violated by defense counsel. After that occurred this Court made a note to itself to draft an instruction to be included in the jury instructions 'cause at the time that was the path this Court thought was best to remedy that situation. The Court made a second note after the questions regarding the no contact orders and also a note to myself regarding following up on this outside the presence of the jury. Once the Court got to the

questioning and the statement regarding custody and residence, this Court became very concerned. The Court is not certain of the motive behind the structuring of the questions regarding custody and residence and I will not speculate about that.

. . .

Violating a motion in limine is concerning and should be considered by the Court. Questions that elicit a response regarding separate orders on no contact orders even if not shown as intentionally meaning to do that are concerning and should be considered, but the statement by the defense counsel, quote, and you know what you say whether your dad is convicted can impact where you live, was highly inappropriate. It was suggestive, it was not accurate, it could give the jury the belief that what they decide could affect a civil case, it could affect, it could affect jurors deciding a verdict based on what they, where they think a child could live opposed to if the State proved their case and that's where this Court is concerned about Mr. Rose receiving a fair trial based on that questioning. It was a statement more than a question, it was inappropriate. That question was then followed by quote, [C.R.], have you ever, have you been told what happens in Court here will affect where you live, although this time it was more of a question opposed to a statement, it was still highly inappropriate given the timing. The Court finds there's no way to instruct the jury to ignore the question and the statement and be confident that the jury will do so.

[¶20.] The magistrate court later entered an order denying Rose's motion to dismiss due to double jeopardy, along with written findings of fact and conclusions of law. A third jury trial was held on February 10 and 11, 2022. C.R. was not called to testify. At the conclusion of this trial, Rose was convicted of simple assault (attempt to cause bodily injury) and was sentenced to 180 days in jail with all suspended, on various conditions. A judgment of conviction was entered on February 28, 2022.

[¶21.] Rose appealed his judgment of conviction to the circuit court on March 7, 2022. The circuit court held a hearing on Rose's appeal and affirmed the

magistrate court's decision. In so ruling, the court concluded that absent any indication that the magistrate court's decision "was arbitrarily made" or "without any basis," it could not find an abuse of discretion. Rose appeals the circuit court's order affirming the magistrate court's judgment.

## Standard of Review

[¶22.] Although this is an appeal from a circuit court's order, the circuit court was functioning here as an intermediate court of appeals. *See State v. Delfs*, 396 N.W.2d 749, 752 (S.D. 1986). As in *Delfs*, the circuit court did not hear the evidence or testimony. *See id.* Therefore, "the circuit court decision is not entitled to any deference." *Id.*

[¶23.] As to the magistrate court's decision, we review the grant or denial of a mistrial for an abuse of discretion. "An abuse of discretion is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *State v. Shibly*, 2023 S.D. 30, ¶ 21, 993 N.W.2d 143, 150 (quoting *State v. Nelson*, 2022 S.D. 12, ¶ 35, 970 N.W.2d 814, 826). *See also State v. Anderson*, 1996 S.D. 46, ¶ 21, 546 N.W.2d 395, 401 (reviewing trial court's decision on a motion for a mistrial for an abuse of discretion).

## Analysis

[¶24.] On appeal, Rose claims the magistrate court abused its discretion in granting the State's motion for a mistrial, and as a result, he further claims his right to be free from double jeopardy was violated when he was subsequently tried for the same offense. He argues the sole basis for granting the mistrial was defense

counsel's questions regarding the effect of his conviction on where C.R. would reside. Rose notes that the magistrate court, after sustaining two objections to his counsel's initial questions on this topic, properly overruled the State's objection to the reformulated question as to whether C.R. had been told that what happens in this case could affect where he would live. Rose contends such questioning bore on C.R.'s credibility, which he claims was "deeply at issue in both the first and second jury trials." In Rose's view, by granting the motion for a mistrial, the court "allowed the State to pursue a third trial with a 'more favorable' opportunity to convict" him.

[¶25.] The State maintains the magistrate court properly declared a mistrial because the questions to C.R. about the effect of Rose's conviction were improper and confused the issues before the jury. The State acknowledges that Rose is entitled to challenge C.R.'s credibility but asserts the magistrate court properly imposed reasonable limitations on defense counsel's cross-examination. The State also notes that the magistrate court based the mistrial not only on the questions regarding the effect of Rose's conviction on where C.R. lives, but also on defense counsel's violation of the motion in limine regarding the prior trial and the questions resulting in C.R.'s reference to the no-contact order. The State argues that the mistrial was necessary because of the likelihood that these questions and answers on topics that should not have been mentioned impacted the impartiality of the jury. The State therefore asserts that the Double Jeopardy Clause was not violated when Rose was retried for the offenses at issue.

[¶26.] It is well-settled that "[a] state may not put a defendant in jeopardy twice for the same offense." *Delfs*, 396 N.W.2d at 751 (citing *Benton v. Maryland*,

395 U.S. 784, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969)). "Jeopardy attaches when the trial commences, and in a jury trial, that occurs when the jury is impaneled and sworn." *Delfs*, 396 N.W.2d at 751 (citations omitted). "However, 'the conclusion that jeopardy has attached begins, rather than ends, the inquiry as to whether the Double Jeopardy Clause bars retrial.'" *Id.* (citation omitted).

[¶27.]     Where, as here, the action has not concluded in a final judgment, a retrial is not automatically precluded:

> Unlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused. Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury. Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, *the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar.*

*Id.* (quoting *Arizona v. Washington*, 434 U.S. 497, 505, 98 S. Ct. 824, 830, 54 L. Ed. 2d 717, 728 (1978) (emphasis added)).

[¶28.]     The State's "burden is a heavy one." *Delfs*, 396 N.W.2d at 751. It must "demonstrate 'manifest necessity' for any mistrial declared over the objection of the defendant." *Id.* (quoting *Arizona*, 434 U.S. at 505, 98 S. Ct. at 830). The "manifest necessity" test was set forth in the seminal case of *United States v. Perez*, wherein the Supreme Court explained:

> We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the

> circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere.

*Delfs*, 396 N.W.2d at 751 (quoting *United States v. Perez*, 22 U.S. 579, 580, 6 L. Ed. 165 (1824)).

[¶29.] In applying this governing law, we have observed that "[t]his formulation does not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge." *Id.* (citing *Arizona*, 434 U.S. at 506, 98 S. Ct. at 830–31). "Therefore, the key word 'necessity' cannot be interpreted literally; instead, it is assumed that there are degrees of necessity and a 'high degree' is required before a mistrial will be appropriate." *Id.* at 752 (citation omitted). We have further held that "[a]n actual showing of prejudice must exist to justify the granting of a mistrial." *Id.* Prejudice exists when there is a reasonable probability that the matters erroneously presented at trial could affect the jury's verdict in a manner that "is harmful to the substantial rights of the party assigning it."[1] *State v. Delehoy*, 2019 S.D. 30, ¶ 31, 929 N.W.2d 103, 111 (other citations omitted).

[¶30.] Applying these principles, we note at the outset that, contrary to Rose's narrow view of the basis for the magistrate court's decision, the court identified three reasons for granting the mistrial: (1) the references by Rose's

---

1. Although *Delehoy* cites the often-quoted phrase "in all probability" when describing what constitutes prejudice, this Court recently clarified in *State v. Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d 674, 686, that "in all probability" means a reasonable probability.

counsel and C.R. to the previous trial; (2) C.R.'s reference to the no-contact order in response to a question by counsel as to why he had not seen his dad for over two years; and (3) the questions regarding how the trial's outcome might impact where C.R. lives.

[¶31.]    With regard to the first issue, the magistrate court granted a pretrial motion in limine precluding any mention of Rose's first trial. Defense counsel violated this order during a colloquy with C.R. about how things were different since C.R. last testified. During this colloquy, counsel asked C.R. whether the *jury* was in a different spot. Later, while attempting to impeach C.R. with his prior testimony, counsel asked him if he remembered testifying previously and C.R. responded: "Yes. But it became - - it was a mis-jury thingy. I don't remember what it's called . . . It was a hanged jury."

[¶32.]    When the magistrate court was later considering the mention of the prior jury as one of the bases for the State's mistrial motion, defense counsel explained that the later question was not intended to elicit that testimony and the court agreed that defense counsel did not intentionally solicit this information. Notably, the State did not move for a mistrial after these particular questions and answers and the court promptly remedied the matter by issuing a cautionary instruction, directing the jury to disregard the testimony. Although we generally presume the jury followed this instruction, *see Shibly*, 2023 S.D. 30, ¶ 27, 993 N.W.2d at 151, the reference to a prior hung jury is nevertheless concerning as this tends to impart the notion that the State's case was previously found insufficient to sustain a guilty verdict.

[¶33.] In regard to the second basis for the magistrate court's ruling— the reference to the no-contact order—unlike the order precluding any mention of the first trial, neither party moved in limine to exclude evidence that Rose was ordered to have no contact with C.R. In fact, this topic was raised at the first trial, without objection from the State. Also, unlike counsel's inadvertent mention of a prior jury, Rose's counsel did not, at the second trial, specifically mention the no-contact order. It was in response to counsel's question to C.R. if he knew why he hadn't seen his dad since the events in question occurred that C.R. answered, "[b]ecause there is a no-contact order in place."

[¶34.] Although the State objected to C.R.'s answer and the magistrate court sustained the objection and instructed the jury to disregard it, the bases for the State's objection and the court's ruling are not clear. Seemingly, the existence of a no-contact order in a case involving a simple assault charge would neither be remarkable nor surprising to a jury. The no-contact order also bears some relevance in the sense that it explains why C.R. had not seen his father for over two years and it was part of Rose's effort to explore whether the child's testimony was being influenced by his mother. But even if the mention of the no-contact order was improper, it is likely that such evidence would have been more prejudicial to Rose than the State, as it could cause the jury to infer C.R. was still in need of protection from Rose. It is not apparent how this would have been "harmful to the substantial rights" of the State. *See Delehoy*, 2019 S.D. 30, ¶ 31, 929 N.W.2d at 111.

[¶35.] Finally, as to the third basis for the magistrate court's ruling, Rose claims his counsel's questions regarding the effect of a conviction on where C.R.

would live should have been allowed as a proper avenue to challenge C.R.'s credibility, which he maintains was "deeply at issue."[2] He also emphasizes that, after a bench conference, the magistrate court overruled the State's objection to his counsel's reformulated question about what C.R. had been told.

[¶36.]     Citing *State v. Dickerson*, 2022 S.D. 23, ¶ 27, 973 N.W.2d 249, 258, in which we addressed a defendant's right to cross-examine a witness regarding possible motives to testify falsely, Rose claims he should have been allowed to question the motives underlying C.R.'s testimony. More specifically, Rose claims that he was entitled to "explore the mother's influence upon C.R. including the issue of child custody." In support, Rose cites cases from other jurisdictions in which courts have allowed cross-examination in criminal cases about related civil proceedings that may provide a motive for a witness to testify in a certain manner. However, these cases involved adult witnesses who were questioned about pending custody proceedings or other civil litigation in an effort to reveal a possible

---

2.     As examples of how C.R.'s credibility was questionable, Rose notes that when his counsel asked C.R. about the reason he was grounded, C.R. testified at the second trial that it was because he failed to do his chores, but at the first trial, C.R. testified that he was grounded as punishment for misbehaving at school. Also, despite prior testimony describing his injury as not being a slap, but rather a bop, on direct examination at the second trial, Rose notes C.R.'s testimony that after talking with Herra and seeing a photo of the mark by his ear, "we realized that it was, um, a slap." Rose further notes that C.R. testified at the second trial that Rose's girlfriend had struck him multiple times with a studded belt, but this claim was refuted by social worker Pond's testimony that C.R. did not have any bruises that would be consistent with being struck with such a belt.

pecuniary motivation.[3] Here, the magistrate court's concerns regarding the manner in which such questions were posed to a young child like C.R. were legitimate, particularly when C.R. was asked whether he *knew* that what he says and whether his dad is convicted could impact where he lives. But the latter reformulated question that the court allowed as to what C.R. *had been told* in this regard was arguably a fair matter of inquiry. In any event, C.R. ultimately denied that his mother had talked to him about this topic, so it is not so clear how the State was prejudiced by the one answer the child was allowed to give.

[¶37.] While each of the three bases the magistrate court relied on when granting a mistrial may have been insufficient when considered in isolation, to establish prejudice sufficient to necessitate a mistrial, the State contends the magistrate court properly considered the cumulative effect of all three issues. In support, the State cites *Nebraska v. Todd*, 894 N.W.2d 255, 259–65 (Neb. 2017), which affirmed a trial court's grant of a mistrial after the court had "sustained multiple objections and struck multiple answers in a short period of time." Rose argues, however, that *Todd* is distinguishable because here, aside from the one inadvertent mention of the prior jury, the topics that were the basis for the mistrial had not been ruled inadmissible prior to trial. In contrast, Rose notes that in *Todd*,

---

3.    *See e.g.*, *State v. Filler*, 3 A.3d 365, 371 (Me. 2010) (holding that evidence of a custody dispute was relevant to whether the defendant's wife had a motive to fabricate her allegations in a domestic assault case); *Doumbouya v. Cnty. Court of City & Cnty. of Denver*, 224 P.3d 425, 429 (Colo. App. 2009) (holding that questions about the defendant's and the alleged victim's marriage dissolution and child custody proceedings were relevant for purposes of impeachment and to show a motive for the estranged wife to falsely accuse the defendant).

the mistrial was granted after the introduction of a subject that had been precluded by an order granting a motion in limine and by a ruling denying a proposed jury instruction on a particular defense theory. *Id.* at 259.

[¶38.]        In *Todd*, after multiple violations of the order excluding references to this particular defense, the trial court granted a mistrial. *See id.* On appeal, the Nebraska Supreme Court affirmed, concluding there was a "high degree of necessity to declare a mistrial." *Id.* at 264. The court provided this explanation for its conclusion:

> The county court declared a mistrial because it determined that defense counsel had repeatedly attempted to present evidence to the jury in violation of the court's order in limine. The county court explained that it declared a mistrial because it determined that defense counsel's actions could affect the impartiality of the jurors. As in *Arizona v. Washington*, the trial judge in this case was in the best position to assess the potential impact on the jury. The record shows that the county court acted responsibly and deliberately rather than precipitously. The court did not declare a mistrial upon the first violation of the order in limine. Instead, the court initially attempted the conservative measure of striking answers it found to have violated its order in limine. After a number of violations, the court declared a mistrial only after two additional occurrences that it determined had "tipped the scale toward a mistrial."

*Id.* at 265 (citing *Arizona*, 434 U.S. at 514–16, 98 S. Ct. at 834–36).

[¶39.]        Unlike in *Todd*, where counsel asked three questions in violation of the trial court's order, only one of defense counsel's questions referred to a topic that was the subject of an order in limine, and the magistrate court deemed this to be inadvertent. It was C.R. who unexpectedly referred to the prior hung jury in response to a question that was not objectionable. Neither of the other two topics forming the basis for the mistrial was the subject of an order precluding counsel

from mentioning them. However, the process the Nebraska court applied in *Todd* was very similar to the magistrate court's process here, where the court initially imposed other remedial measures and only granted a mistrial after giving both sides multiple opportunities to explain why a mistrial should or should not be granted.

[¶40.] Ultimately, when determining whether the magistrate court abused its discretion by granting a mistrial here, we must ascertain whether there was a reasonable probability that the matters improperly presented to the jury could have affected the State's ability to obtain a fair trial. *See Delehoy*, 2019 S.D. 30, ¶ 31, 929 N.W.2d at 111. Although this Court has recognized that "only in very extraordinary and striking circumstances" should a jury be discharged before reaching a verdict, we have further acknowledged that "[t]here may be unforeseeable circumstances that arise during a trial making its completion impossible[.]" *Delfs*, 396 N.W.2d at 753 (quoting *State v. Standing Soldier*, 299 N.W.2d 568, 570–71 (S.D. 1980)). We have also recognized in prior cases reviewing the propriety of a ruling on a motion for a mistrial that the trial court is "in the best position to judge the emotionality of the situation and gauge the risk of prejudice resulting from the cumulative acts of the witness." *Shibly*, 2023 S.D. 30, ¶ 29, 993 N.W.2d at 151; *see also, State v. Perovich*, 2001 S.D. 96, ¶ 24, 632 N.W.2d 12, 17 (noting that this Court's review of a "cold record invariably lacks the emotion of the occurrence below"). We have thus concluded that "[w]hether or not these emotions amount to circumstances that create an unfair trial is best addressed within the discretion of the trial court." *Perovich*, 2001 S.D. 96, ¶ 24, 632 N.W.2d at 17–18.

[¶41.] Admittedly, this case is a close call. However, in reviewing for an abuse of discretion, the question is not whether we would have made the same decision as the trial court. Considering all the circumstances, as we must, *see Delfs*, 396 N.W.2d at 751, and giving due deference to the magistrate court, which was better positioned to judge the impact that the statements, repetitive objections, and the court's rulings may have had on the jurors, it is not so clear that the court abused its "considerable discretion" in granting a mistrial. *See State v. Pasek*, 2004 S.D. 132, ¶ 15, 691 N.W.2d 301, 307.

[¶42.] The reference to the prior hung jury, a topic that was precluded by a pretrial order, was particularly problematic. As noted in *Arizona v. Washington*, "the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment." 434 U.S. at 511, 98 S. Ct. at 833. Moreover, when the improper reference to a hung jury is considered along with the other questions and answers the magistrate court deemed improper, we cannot say the court "clearly abused" its considerable discretion in determining that there was a manifest necessity warranting a mistrial. *See Pasek*, 2004 S.D. 132, ¶ 15, 691 N.W.2d at 307 (noting that a trial court's "considerable discretion" must be "clearly abused" for reversal of mistrial); *see also Arizona*, 434 U.S. at 505, 98 S. Ct. at 830 (noting that a defendant's "valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.").

#30484

[¶43.]     Affirmed.

[¶44.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices,

concur.