#30916-a-PJD
**2025 S.D. 68**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

RONALD PETER CLEMENSEN,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
SPINK COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBERT L. SPEARS
Retired Judge

* * * *

MARTY J. JACKLEY
Attorney General

ERIN E. HANDKE
Assistant Attorney General
Pierre, South Dakota                    Attorneys for plaintiff and
    appellee.


CASEY N. BRIDGMAN
Wessington Springs, South Dakota

WILLIAM D. GERDES
Aberdeen, South Dakota                    Attorneys for defendant and
    appellant.

* * * *

CONSIDERED ON BRIEFS
AUGUST 26, 2025
OPINION FILED **11/25/25**

DEVANEY, Justice

[¶1.]      Ronald Clemensen was charged with multiple counts of theft by exploitation of his elderly mother.  The charges related to his mortgaging of family farm ground to obtain loan proceeds, as well as his use of funds transferred from his mother's investment account, which he needed to help cover debts of his failing business.  After a trial, a jury found him guilty of all counts.  Clemensen appeals his convictions, alleging the State failed to present sufficient evidence to prove the elements of the crimes charged.  He also asserts the circuit court failed to properly instruct the jury regarding his good faith defense.  We affirm.

## Factual and Procedural Background

[¶2.]      Arlo and Betty Clemensen had a family farm of approximately 1,440 acres in Spink County.  Over the years, Betty kept up the home, while Arlo ran the farm and handled their finances.  They raised two children, Ronald and Patrice (Patti).  Patti had three sons: Brent, Brad, and Brock Klapperich.  Clemensen was unmarried and had no children.  He farmed with Arlo, and he continued to farm after Arlo and Betty moved to Aberdeen, South Dakota.  He acquired some of his own farm ground as well.  In addition to farming, Clemensen had a business in Aberdeen called Crossroads Truck and Trailer (Crossroads) that he owned with a business partner.

[¶3.]      When Arlo passed away in 2011, Clemensen took over the management of his 85-year-old mother's financial affairs and was her primary caregiver.  They went to Plains Commerce Bank where she had a checking account and signed an agreement identifying both as joint owners of the account.  Under the

account agreement, each was able to make withdrawals. Clemensen used this account to pay Betty's bills. The account was funded by Betty's monthly Social Security benefits and disbursements from an investment account she had at the Edward Jones financial services company in Aberdeen.

[¶4.] In 2014, Clemensen took Betty to see Carolyn Thompson, a lawyer in Sioux Falls. Thompson created estate planning documents for both Betty and Clemensen. Betty's documents included a springing durable power of attorney, effective upon Betty's incapacity, naming Clemensen as her agent. Betty signed the power of attorney on July 29, 2014. The same day, Betty executed a trust agreement establishing the Betty Clemensen Living Trust (Trust), as well as accompanying documents that stated Betty was transferring all her property, real or personal, to the Trust.[1] The Trust was revocable and Betty was named the sole

---

1. The Schedule A (list of property) page accompanying the Trust agreement was blank and unsigned. On July 29, 2014, Betty executed an assignment of property transferring all right, title, and interest in her personal property of a personal or household nature. She also executed another document, an assignment and nominee agreement signed as "Trustor and Trustee," which stated, in part:

> WHEREAS, Trustor hereby transfers all property owned by Trustor to the Trust, including, but not limited to, the property identified on Schedule A, whether real or personal, tangible or intangible, but exclusive of annuities, IRA's, retirement plans under the Internal Revenue Code, or any property the transfer of which would violate any agreement restricting transfer of such property or cause any tax to become due ("Property");

> WHEREAS, Trustor intends that any Property presently owned or acquired hereafter by any means shall be owned by Trustee[.]

On December 5, 2014, Betty signed trustee's deeds, later recorded, that transferred into the Trust the real estate, which at the time was held in a

(continued . . .)

initial trustee and initial beneficiary of the Trust. Clemensen and Patti were named successor co-trustees, and they, along with Patti's sons, were named as beneficiaries of the Trust. Among other powers granted in the Trust agreement, the trustee had the power to mortgage Trust property.

[¶5.] In late 2015, the Thompson law firm prepared a new durable power of attorney (POA) for Betty, who signed it on January 4, 2016. This POA was identical to the one she signed in 2014, with the exception that, instead of becoming effective upon Betty's incapacity, it was effective immediately upon execution. It named Clemensen as her agent. The POA did not contain a provision authorizing Clemensen to self-deal. It did contain language authorizing the agent to make a gift to a descendent of Betty's, as long as similar gifts are made equally to all descendants of the same generation.

### Edward Jones account

[¶6.] Arlo and Betty did well for themselves, and in addition to their farmland, their assets included retirement and investment accounts managed by Edward Jones. Their financial advisor, William Edwards, had known the couple

_____

(. . . continued)

decedent's trust for Arlo and a survivor's trust for Betty. As to the other property at issue, Clemensen states, in his initial brief, that "it has been irrefutably proven that the Edward Jones account and the Plains Commerce checking account were owned by The Trust. These assets were not owned by Betty Clemensen." However, we note that the record reflects that, after the Trust was created, neither account was re-titled in the name of the Trust. No one from Plains Commerce testified, and with respect to the Edward Jones account, financial advisor William Edwards testified at trial that he did not believe the account was ever put into a trust, and that the account statements would reflect whether it was. These statements identify "Betty Clemensen" as the account holder during the relevant time period.

since the early 1980s when they became his clients. He described Arlo as a prudent, intelligent man who largely made the investment decisions, as Betty was not as knowledgeable in the financial area. In June 2014, Betty signed Edward Jones paperwork naming Clemensen as her agent and attorney in fact, and authorizing him to speak with Edward Jones personnel about Betty's account and to make account-related decisions. This gave him authority to buy, sell, and trade stocks, bonds, and other securities; request delivery of securities and payment of funds; and write checks on the account. However, his authority to withdraw funds from the account, per the authorization signed by Betty, was "limited to the payment of monies to the account owner," i.e., Betty.

[¶7.]     In early August 2015, Clemensen needed money for Crossroads, which was struggling financially. He and Betty met with Edwards to discuss a way to obtain $88,000 from her account that would ultimately go to Clemensen to use for Crossroads. Instead of selling any of the investment account assets, Edwards suggested a margin loan against Betty's account.[2] Edwards testified at trial that, during this meeting, he asked Betty whether she wanted to do this, with the expectation that Clemensen would pay her back in a short period of time, no more than six months.[3] Edwards testified that it was ultimately Betty's decision and she agreed to sign off on the margin loan, indicating that she needed to help her son. As

---

2.    At trial, Edwards explained that a margin loan is a loan borrowed by the account owner, which is collateralized by the assets of the account and is to be paid back with interest. Such loans reduce the net value of the account.

3.    There is nothing in the record memorializing any agreement by Clemensen to pay back his mother for this margin loan, or any of the ones that followed.

Edwards noted, Clemensen "was all that Betty had," since Patti was suffering from early-onset dementia and Arlo was gone. As a result, on August 11, $88,000 was electronically transferred from Betty's Edward Jones account and posted to the Plains Commerce checking account on August 12. The same day, Clemensen then transferred $88,000 from this checking account to his account connected with Crossroads.

[¶8.] Clemensen's financial struggles continued. In May 2016, he and Betty returned to Edward Jones to obtain another margin loan against Betty's account. At that point, the 2015 margin loan was still entirely unpaid. Edwards raised his concern to Betty that this trend was "not good." Betty again agreed to a margin loan. When Edwards expressed that this may not be a wise decision, Betty commented, "What's a mother to do?" On May 31, Edward Jones electronically transferred $114,000 from Betty's account to the Plains Commerce checking account. On June 1, Betty signed a check made payable to Clemensen for the same amount.

[¶9.] In 2017, three more margin loan transfers from Betty's Edward Jones account occurred, all electronically deposited into the Plains Commerce checking account. The first was on April 25 in the amount of $50,000; the second on June 15 in the amount of $45,000; and a third on June 28 in the amount of $25,000. Each time, Clemensen wrote and signed checks from the Plains Commerce checking account for like amounts made payable to Crossroads, noting "loan" in the memo line. Edwards testified that for each transaction, the process was much the same: Clemensen needed money for his faltering businesses and requested money from

Betty, Clemensen claimed he would pay her back, Betty would authorize the margin loan, and funds would be sent to the Plains Commerce checking account. Edwards testified that, during their meetings, it was evident that Clemensen expected he would be getting the funds, as it appeared he had made his needs known to Betty before they came to the office.

[¶10.] These margin loan transactions caused Edwards growing concern, which he expressed to Betty. He felt Clemensen "was in a bind" with his business and needed money, and that he looked to Betty's account as a source for funds, telling Edwards he would pay it back "soon." But this did not occur, and the margin loan balance had grown to over $300,000 by the end of June 2017 and continued to accrue interest. According to Edwards, when Arlo was alive, he and Betty built up a nice "nest egg" with the account and they had never withdrawn funds from the account in this manner. Only after Arlo passed did these types of transfers occur. Edwards was also concerned because Betty's cognitive abilities were declining. It was so unsettling that Edwards reached out to the legal department at his company's home office to see what could be done. He was told he could not authorize any more margin loans against the account.

*Mortgages*

[¶11.] Some of Arlo and Betty's family farm ground was mortgaged to provide security for bank loans to Clemensen. One mortgage was executed in 2010, after Clemensen was denied a loan from Dakotah Bank in Aberdeen and Arlo and Betty thereafter requested a loan in their names to assist Clemensen, who was a co-signer on the loan. Another Dakotah Bank mortgage, which was dated March 31, 2015,

and executed by Betty as trustee of her Trust, secured a promissory note that only Clemensen signed. Some of the loan funds were used by Clemensen for the Crossroads business. By 2016, Clemensen's finances were declining and he was having trouble paying off his Dakotah Bank loans; lenders at the bank asked him to find financing elsewhere. He turned to other lenders, and ultimately he signed three mortgages that mortgaged Trust property and which provided the bases for three of the criminal charges in this case.

[¶12.] One mortgage was with Great Plains Bank, an Aberdeen bank, in September 2016. Great Plains had been loaning money to Crossroads, but reached a point where it would no longer do so. The bank agreed to loan Clemensen $100,000 individually; the money would be used to cover overhead at Crossroads. Great Plains required security for the loan, and Clemensen suggested using his "mother's land." Clemensen provided Great Plains with the Trust and POA documents. Based on his review of these documents, the loan officer determined that Clemensen could sign the mortgage as POA for Betty. The mortgage was secured by a quarter section of Betty's Trust property. The loan officer did not speak with Betty. On September 19, 2016, Clemensen executed the mortgage on behalf of Betty, as trustee for the Trust, by signing "Ronald Clemensen, POA." Clemensen signed the promissory note individually. The mortgage was thereafter recorded with the Spink County register of deeds.

[¶13.] Two other mortgages at issue in this case were executed in September 2016 with First Dakota National Bank, which agreed to make two loans to Clemensen, each in the amount of $750,000, for a total of $1.5 million. The 30-year

notes were secured by several quarters of the farmland held in the Trust, as well as a small amount of land held in Clemensen's trust. The proceeds of these loans would be used to pay Dakotah Bank and satisfy the balance of the original 2010 loan that Clemensen co-signed with Arlo and Betty ($665,660.57), with the remainder satisfying, or partially satisfying, Clemensen's debt with Dakotah Bank.

[¶14.] First Dakota initially prepared the mortgage documents in anticipation of Betty being present to sign as trustee of her Trust. However, a few days before closing, Clemensen told First Dakota that Betty could not attend because she was ill. After Clemensen said he could sign on her behalf as POA, First Dakota's closing personnel reviewed the Trust and POA documents and received approval from their secondary market vendor to proceed to closing with Clemensen signing as POA for Betty. On September 29, 2016, a First Dakota loan officer conducted the closing at the farm with Clemensen. Clemensen signed the mortgages on behalf of the Trust as "Ronald Clemensen, POA." He signed the promissory notes as the sole borrower on these new notes. These mortgages were also recorded with the Spink County register of deeds.

*Law enforcement investigation*

[¶15.] Law enforcement became involved in the summer of 2017 after Betty's grandson Brett, who lived out of state, received a document that gave him pause. The document was an acknowledgement drafted for the purpose of obtaining signatures from Patti and her adult sons, who were all beneficiaries under the Trust. It identified 630 acres of Trust farm ground, as well as Betty's house in Aberdeen, and stated that the Trust intended to sell this real estate and the signers

-8-

were asked to acknowledge that they had no objection.[4]  After following up with Clemensen, Brett had concerns, leading him to register an elder abuse complaint with a state agency.  The agency referred the matter to Dave Lunzman, then an agent with the South Dakota Division of Criminal Investigation who investigated elder abuse and financial crimes involving elders.

[¶16.]       Agent Lunzman began his investigation by gathering documents, including Betty's Trust agreement and her POA.  In late August 2017, Agent Lunzman visited Betty, who lived in an assisted living facility in Aberdeen.  He noted she was a very sweet and pleasant lady, but she struggled to answer simple questions.  For example, she did not know how long she had lived in the facility and did not know the date or her birthdate.  She thought Arlo passed away in 1945, when it had occurred just six years prior.  It was evident to Agent Lunzman that Betty's memory was not very good.

[¶17.]       Agent Lunzman became aware of a court hearing in a pending civil case involving Clemensen, so he attended to observe Clemensen testify under oath. He heard Clemensen explain that he had been "taking care of everything" regarding Betty's affairs since Arlo passed away, and that Betty had day-to-day short-term memory issues and was unable to handle her own business affairs.

---

4.       Brock, who signed the acknowledgment, later testified at trial that he did so because Clemensen told him it was necessary if he "wanted to keep the farm." Brett never signed the acknowledgement, and the proposed financing and sale did not occur.

Upon learning additional information regarding what had been going on with the Trust real estate, Brock filed a petition on August 20, 2017, seeking to be appointed conservator of Betty, who he alleged had severe short term memory loss and dementia.  He was thereafter appointed as her conservator.

[¶18.] As part of Agent Lunzman's investigation, he obtained a search warrant to search Crossroads for records related to the matters being investigated. The warrant also authorized seizure of Clemensen's cellphone. Later analysis of the phone revealed information demonstrating that Clemensen and his trucking business were undergoing a lot of financial strife and he was having difficulty paying his employees and his bills. At trial, Agent Lunzman paraphrased one text where Clemensen indicated that he "had the money and it's in mom's account." While at Crossroads, Agent Lunzman interviewed Clemensen. Clemensen explained that his mother got sick near the end of 2016 and in January or February 2017 she moved into the assisted living facility because, according to Clemensen, she was having difficulty with her memory. Clemensen also talked about the two $750,000 loans, which he said were to pay off his land and take care of his affairs, with some funds going to Crossroads. He admitted that he had himself in a bind financially and was trying to fix it in the best way he knew how. He also admitted that he was benefitting from Betty in ways that his sister Patti was not.

[¶19.] As a result of the investigation, Clemensen was indicted on multiple felonies, including two counts of aggravated grand theft by exploitation in an amount greater than $500,000 relating to the two separate mortgages with First Dakota in 2016 securing loans to Clemensen; and five counts of grand theft by exploitation in an amount more than $5,000 and less than or equal to $100,000 relating to the $100,000 mortgage securing his 2016 loan from Great Plains, as well as the four transfers of funds in 2015 and 2017 from Betty's Edward Jones account

to the Plains Commerce bank account that Clemensen withdrew and used for Crossroads.

[¶20.]     At trial, the State's case-in-chief included testimony from Brett, Agent Lunzman and another investigator, and a paralegal from the Thompson law firm. The jurors also heard extensive testimony during Clemensen's case-in-chief from Edwards and numerous banking officials involved in the various loans and mortgages. Additionally, both sides presented testimony from attorneys who explained estate planning documents such as trusts and powers of attorney. Clemensen did not testify. The jury was also presented with an excerpt from a circuit court's memorandum decision issued in March 2021 in a separate civil case by the personal representative of Betty's estate against Clemensen and others, including First Dakota. In that ruling, the circuit court determined that only the trustee had the power to encumber the Trust property and because Clemensen lacked the authority to do so as POA, the court declared the 2016 First Dakota mortgages void. Clemensen moved for judgment of acquittal at the close of the State's evidence and again after trial. At the conclusion of trial, the jury found Clemensen guilty of all seven charges. At sentencing, the court imposed fully suspended penitentiary sentences and placed Clemensen on probation.

[¶21.]     On appeal, Clemensen presents, as separate issues, multiple arguments claiming that the State did not prove the elements of the charged offenses beyond a reasonable doubt, and that the court should have granted his motion for judgment of acquittal. We restate these claims as a challenge to the

sufficiency of the evidence supporting the offenses. Clemensen also claims that the circuit court failed to properly instruct the jury on his good faith defense.

## Analysis and Decision

### 1. Whether the evidence was sufficient to support the convictions.

[¶22.] We have held that "a motion for a judgment of acquittal attacks the sufficiency of the evidence." *State v. Timmons*, 2022 S.D. 28, ¶ 14, 974 N.W.2d 881, 886 (citation modified). Furthermore,

> "We review a denial of a motion for judgment of acquittal de novo." [*State v. Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d 301, 313] (citation omitted). "In measuring the sufficiency of the evidence, we ask 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83). We "will not resolve conflicts in the evidence, assess the credibility of witnesses, or evaluate the weight of the evidence." *Id.* (citation omitted). Instead, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Id.* (citation omitted). "It is the jury's responsibility, not ours, 'to decide what conclusions should be drawn from evidence admitted at trial.'" *State v. Strozier*, 2013 S.D. 53, ¶ 24, 834 N.W.2d 857, 865 (citation omitted). "Moreover, the jury is . . . the exclusive judge of the credibility of the witnesses and the weight of the evidence." *Seidel*, 2020 S.D. 73, ¶ 32, 953 N.W.2d at 313 (omission in original).

*State v. Bolden*, 2024 S.D. 22, ¶ 39, 6 N.W.3d 238, 246–47.

[¶23.] Clemensen was charged with criminal theft by exploitation under SDCL 22-46-3, which required the State to prove that Clemensen assumed the duty to provide for the support of Betty, an elder; was entrusted with her property; and that he did, with intent to defraud, appropriate her property "to a use or purpose

not in the due and lawful execution of [her] trust."[5] We address each of these elements in turn.

### *Assumed the duty to provide support*

[¶24.] Clemensen contends the evidence was insufficient to show that he had the duty to support Betty, citing SDCL 25-7-27, which states, "[a]ny adult child, having the financial ability to do so, shall provide necessary food, clothing, shelter, or medical attendance for a parent who is unable to provide for oneself." He claims there was no evidence that Betty was unable to provide for herself, as she had significant assets and was not indigent.

[¶25.] Clemensen's reliance on this statute is misplaced. SDCL 22-46-3 contains no reference to that statute. And while circumstances identified in SDCL 25-7-27 *may* be found, in an appropriate case, to constitute a duty to support under SDCL 22-46-3, it is clear from the language in SDCL 22-46-3 that this is not the only scenario that may give rise to such duty. SDCL 22-46-3 refers to those who have *voluntarily* assumed the duty to support or those who have done so by contract

---

5. SDCL 22-46-3 states in its entirety:

> Any person who, having assumed the duty voluntarily, by written contract, by receipt of payment for care, or by order of a court to provide for the support of an elder or an adult with a disability, and having been entrusted with the property of that elder or adult with a disability, with intent to defraud, appropriates such property to a use or purpose not in the due and lawful execution of that person's trust, is guilty of theft by exploitation. Theft by exploitation is punishable as theft pursuant to chapter 22-30A.

The class of felony for a charge under this statute depends on the value of the property appropriated, which must also be proven.

or by receiving payment for care. Nothing in SDCL 22-46-3 suggests that criminal exploitation can only occur if the elder adult is indigent, as Clemensen's argument posits. Indeed, we have upheld the criminal conviction under this statute of a defendant who took advantage of an elderly man who was paying the defendant for his care. *See State v. Warren*, 462 N.W.2d 195, 197, 200 (S.D. 1990) (affirming a theft by exploitation conviction of a defendant who operated an elder care business and charged the elderly victim in her care more than what she charged others because "he can afford it" and used her position of trust to obtain a $24,000 check to pay off her mortgage).

[¶26.] Consequently, we reject Clemensen's narrow interpretation of the term "support," as there are other ways, aside from financial, in which individuals may assume the duty to provide support to an elder or person with a disability. The term itself is broad, and we often refer to "dictionary definitions to determine the plain and ordinary meaning of undefined words" in a statute. *Lapin v. Zeetogroup, LLC*, 2025 S.D. 36, ¶ 13, 24 N.W.3d 541, 546 (citation omitted). One such definition of support is to "assist, help." *Support*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/support.

[¶27.] Here, the jury heard uncontradicted evidence, including Clemensen's admissions to Agent Lunzman, that Clemensen handled all of Betty's financial affairs after Arlo died, took care of her home, drove her to appointments, and essentially was the person who took care of whatever she needed. In addition, the fact he agreed to serve as Betty's agent under her POA—with its broad authority to undertake any number of actions with respect to her financial affairs and

property—is another strong indication that he voluntarily assumed the duty to provide for her support. The record provides ample evidence for the jury to have found that Clemensen voluntarily took on the duty to assist or help his mother in ways that would constitute "support" under the statute.

### *Entrusted with property of an elder*

[¶28.]     Clemensen argues that because all of Betty's property was placed in a trust, the property at issue here was owned by the Trust and not by an elder, a term he notes is defined, in SDCL 22-46-1(3), as a "person." Relatedly, he claims he could not be entrusted with her property because only Betty, as trustee, was entrusted with the Trust property. Again, we reject Clemensen's narrow view of SDCL 22-46-3. The Trust document shows that Betty created a revocable trust; named herself as trustee; the property was assigned to Betty, as trustee, and she retained the right, as trustee, to use all or part of both the Trust income and principal for her own benefit. Thus, for purposes of SDCL 22-46-3, the property at issue was Betty's.[6] The object of this statute—protecting elders and adults with disabilities from exploitation—would not be accomplished if the statute is construed to categorically exclude those whose property has been placed into a trust. *See State v. Kwai*, 2023 S.D. 42, ¶ 25, 994 N.W.2d 712, 719 (quoting SDCL 22-1-1, which states

---

6.     We recognize that, in other contexts, the legal status, ownership, and individuals' rights and responsibilities with regard to property may be governed by other laws, including those specifically applicable to trusts, probate, and taxes. We express no opinion, and do not decide, how the property in this case, and the individuals' relationships to it, may be construed under those laws, as those matters are not before us. This includes whether all of Betty's property was *in fact* successfully transferred into her Trust.

that penal statutes are to be interpreted "according to the fair import of their terms, *with a view to effect their objects* and promote justice" and further noting that the statute "abrogated the common law rule 'that penal statutes are to be strictly construed'" (emphasis added)).

[¶29.] Moreover, the evidence introduced at trial showed that Clemensen took it upon himself, as Betty's POA, to engage in transactions relating to the Trust property. Betty's POA granted Clemensen broad powers, as her agent, to engage in transactions relating to real property, as well as bank and investment accounts and transactions. It also referred to specific powers with respect to her Trust. Although it was later determined in a civil lawsuit that only Betty, as trustee, could authorize a mortgage on Trust property, it is via this POA that Clemensen executed the three mortgages at issue in Counts 6−8. The jury could have reasonably found that, at the time of the offenses, Clemensen was acting as someone entrusted with Betty's property when doing so.

[¶30.] The same can be said with respect to Counts 9−12 involving the funds originating from the Edward Jones account, deposited into the Plains Commerce bank account, and then withdrawn by Clemensen. Although Betty signed off on the Edward Jones transfers, she had authorized Clemensen as her agent and attorney-in-fact to speak with Edward Jones personnel about her account and to make account-related decisions. She also included Clemensen as a joint owner and authorized signer on the Plains Commerce checking account and there is no dispute that the funds in this account all came from Betty's Edward Jones investment accounts and her Social Security benefits. Therefore, there is sufficient evidence in

the record to support the jury's finding that Clemensen was entrusted with Betty's property.

### Appropriates property for a use and purpose not in the due and lawful execution of the elder's trust

[¶31.]     Clemensen claims that he could not be found guilty of SDCL 22-46-3 because, in his view, the statute requires that property be "stolen," and that nothing was taken or stolen from Betty.  The circuit court disagreed and instructed the jury on the elements by referring to the word that appears in the statute: "appropriates."

[¶32.]     Although this term is not defined in SDCL chapter 22-46, the related term "appropriation" is defined as "[t]he exercise of control over property, esp. without permission; a taking of possession." *Appropriation*, Black's Law Dictionary (12th ed. 2024).  This is consistent with the definition of exploitation in SDCL 22-46-1(5), which states, in part: "the wrongful *taking or exercising of control* over property of an elder . . . with intent to defraud the elder[.]"  (Emphasis added.)  *See Warren*, 462 N.W.2d at 200 (referring to the definition of exploitation in chapter 22-46 when determining that the defendant committed criminal theft by exploitation). Clearly, SDCL 22-46-3 is not limited to scenarios where property is stolen, as Clemensen contends.  Although he relies on the statute's reference to SDCL chapter 22-30A, this reference is not included for the purpose of defining any term in SDCL 22-46-3.  Rather, it simply incorporates the rules for classifying the grade of felony and associated punishment for convictions under SDCL 22-46-3.

[¶33.]     When applying the proper interpretation of this statutory element to the counts involving the mortgages, we determine there is sufficient evidence for the jury to have found that Clemensen's acts of encumbering Betty's Trust property

as collateral for his loans constituted an exercise of control over property, even though the related promissory notes imposed no obligation on Betty. The evidence also supports a finding that Clemensen's mortgaging of the property was for a use or purpose that was not in the due and lawful execution of the trust Betty placed in him. Unlike in earlier years when Arlo and Betty personally signed off on the 2010 mortgage, and when Betty did so in 2015, there was no evidence at trial showing that Betty was even aware of the three mortgages signed by Clemensen in 2016 that are the subject of Counts 6–8. And although Clemensen signed these mortgages using his purported authority as Betty's POA, the POA did not give him authority to mortgage any property for his *own* benefit.

[¶34.]        Clemensen nevertheless argues that, because a circuit court later determined that he lacked the authority to execute the mortgages and declared them to be void, no property of Betty's was appropriated. This argument misses the mark. The circuit court's ruling, four and a half years later, concerning the legal status of the First Dakota mortgages and loans does not change the character of Clemensen's actions in September 2016 when he exercised control over Betty's property by encumbering it with mortgages securing loans which paid off his debts.[7]

---

7.        Clemensen also claims that the State did not prove that the amount of property alleged to be appropriated in the counts relating to the two $750,000 mortgages was at least $500,000. He notes that $665,000 of the $1.5 million in loan proceeds attached to these mortgages went to pay off a debt owed by Arlo and Betty. He then suggests that after subtracting this amount and dividing the remainder by two, the dollar amount attributed to each count is less than $500,000. Clemensen's argument is not oriented to a proper definition of "appropriate." The gist of Counts 6 and 7 is his *exercise of control* over Betty's Trust property by mortgaging it, not how the proceeds of

(continued . . .)

[¶35.] Similarly, the evidence is sufficient to support the jury's finding that Clemensen appropriated Betty's property for a use and purpose not in the due and lawful execution of her trust with regard to Counts 9–12 involving the funds originating from Betty's Edward Jones account. Notably, the testimony from Betty's financial advisor Edwards that she approved the margin loans was tempered by his further testimony that he believed "Ron needed the money and he expected to get it." It was apparent to Edwards that Clemensen viewed Betty's account as a constant source of funding for his failing business. Clemensen himself admitted to Agent Lunzman that he "was in a bind" financially.

[¶36.] Additionally, with respect to the 2017 Edward Jones transactions in particular, evidence at trial showed that these occurred during the timeframe when Betty's cognitive abilities had significantly declined and she was living in an assisted living facility because, according to Clemensen, she was having memory issues. Edwards testified that he became so concerned about Betty's cognitive abilities and the trend of continuing margin loan transfers and Clemensen's failure to pay off the loans, as promised, that he contacted his company's home office and no further loans were permitted.

[¶37.] Considering all the circumstances, the jury could have reasonably refused to give Clemensen the benefit of any approvals by Betty concerning his use of the margin loan funds. Just because an elder may say "yes" to a financial transaction does not mean it is not exploitation, especially when the elder is a

_____

(. . . continued)
the related loans were ultimately used. Each mortgage encumbered Betty's property up to $750,000, so the $500,000 threshold is met for each count.

vulnerable 90-year-old in a relationship of dependency and trust with the person seeking the funds. Indeed, such was the case in *Warren*, where the elderly man paid his caretaker the extra amounts she demanded for his care, explaining that he felt he had "[n]o other choice. Nothing else I can do." 462 N.W.2d at 200−01.

[¶38.] Here, there was evidence in the record that the unpaid margin loans significantly reduced the value of Betty's investment account and that Clemensen used these funds in an attempt to bail himself and his business out of debt, rather than for Betty's benefit. In view of this continuing pattern of transactions, there was sufficient evidence for a rational jury to find that Clemensen's use of these funds was not in the due and lawful execution of Betty's trust.

### *Intent to defraud*

[¶39.] Clemensen argues that there was no evidence admitted at trial to prove he acted with the specific intent to defraud Betty at the time of the transactions at issue. We have held that "an 'intent to defraud' exists when a person acts 'willfully and with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or *bringing about some financial gain to one's self.*'" *Bruggeman by Black Hills Advoc., LLC v. Ramos*, 2022 S.D. 16, ¶ 50, 972 N.W.2d 492, 509 (emphasis added) (quoting *State v. Morse*, 2008 S.D. 66, ¶ 12, 753 N.W.2d 915, 919). This language was provided in an instruction to the jury. The instruction further informed the jury that the term "defraud" means "to deprive another of a right or property by fraud, that is, to gain or seek to gain some unfair or dishonest advantage by any deception, deceit, artifice or unlawful act or *breach of duty or confidence.*" (Emphasis added.)

[¶40.]     In *State v. Kessler,* a theft by deception case, we held that "there must be evidence of . . . an intent to defraud at the time the property . . . is obtained." 2009 S.D. 76, ¶ 11, 772 N.W.2d 132, 136.  As applied here, that would be at the time Clemensen appropriated the property.  We have also recognized that:

> "[b]ecause the nature of intent is such that it is 'rarely susceptible to direct proof, the fact finder may determine intent by such reasonable inferences and deductions as may be drawn from facts proved by evidence in accordance with common experience and observation.'" *State v. Holzer,* 2000 S.D. 75, ¶ 16, 611 N.W.2d 647, 652 (citation omitted).  "The actor's 'state of mind' at the time of the offense may also be determined from his acts, conduct and inferences which are fairly deducible from the circumstances *surrounding* the offense." *Id.* ¶ 15, 692 N.W.2d 794 (emphasis added) (citation omitted).

*State v. Krouse,* 2022 S.D. 54, ¶ 43, 980 N.W.2d 237, 250 (alteration in original).

[¶41.]     From our review of the record, there is sufficient evidence from which a rational jury could find that Clemensen acted for the purpose of bringing about some financial gain to himself or that he gained an unfair or dishonest advantage by a breach of duty or confidence.  Although Clemensen claims Betty "knew what was going on," there is no evidence in the record that Betty was aware, in 2016, that her Trust property was being mortgaged.  The jury could also consider Clemensen's overall history of financial struggles; how his use of his "mother's property" as his go-to for securing his loans increased after Betty signed a new POA in January 2016 making Clemensen her agent, effective immediately; and his use of the POA to benefit himself even though the POA did not allow him to engage in self-dealing.

[¶42.]     Additionally, the circumstances surrounding Clemensen's pattern of coming back to the well to obtain funds from Betty's Edward Jones account are

relevant to his intent. With regard to each of these transactions, the jury could infer that Clemensen had the intent to gain or seek some unfair advantage via a breach of the trust or confidence Betty had placed in him. And while not dispositive of the issue, the fact that the Edward Jones margin loans were not repaid and continued to accrue interest and deplete Betty's investment account is a relevant factor in determining what Clemensen's intent was at the time he used the proceeds of those margin loans for his own benefit to try to get himself out of his financial bind. Unlike in *Kessler*, in which we noted "[t]here is no pattern of conduct on defendant's part of entering into a loan agreement and absconding with the money[,]" 2009 S.D. 76, ¶ 15, 772 N.W.2d at 137, here, there is evidence showing such a pattern. The jury could well infer from the evidence, including Clemensen's failure to repay any of the margin loans, that he never intended, from the outset, to treat these transactions as true "loans" from his mother. With respect to all of the charged offenses, the jury could reasonably find that Clemensen acted with the intent to defraud his mother.

[¶43.] For all the foregoing reasons, we conclude that, when viewed in a light most favorable to the State, the evidence at trial was sufficient for a rational jury to have found Clemensen guilty beyond a reasonable doubt of all seven counts of theft by exploitation.[8] We affirm his convictions.

---

8. Clemensen's other arguments in support of his sufficiency of the evidence challenge are without merit, including his claim that the State failed to prove that he was the person who committed the offenses, which we find to be frivolous. Additionally, Clemensen's argument that the State did not prove venue is waived because he did not raise an objection to venue either before or at trial. *See State v. Hernandez*, 2016 S.D. 5, ¶ 19, 874 N.W.2d 493, 498

(continued . . .)

### 2. Whether the circuit court failed to properly instruct the jury on Clemensen's good faith defense.

[¶44.] It is well settled that a circuit court "has broad discretion in instructing the jury." *State v. Turner*, 2025 S.D. 13, ¶ 49, 18 N.W.3d 673, 690 (citation omitted). Generally, when reviewing a circuit court's decision to grant or deny a jury instruction, we apply "the abuse of discretion standard." *State v. Pfeiffer*, 2024 S.D. 71, ¶ 38, 14 N.W.3d 636, 647 (citation omitted). "However, when the question is whether a jury was properly instructed overall, that issue becomes a question of law reviewable de novo." *Id.* (citation omitted). "[J]ury instructions are to be considered as a whole, and if the instructions when so read correctly state the law and inform the jury, they are sufficient." *State v. Tuopeh*, 2025 S.D. 16, ¶ 14, 19 N.W.3d 37, 46 (citation omitted).

[¶45.] The circuit court gave Clemensen's proposed non-pattern jury instruction regarding good faith, which the court included as Instruction 21. Relevant here, Instruction 21 instructed the jury that "[o]ne of the issues in this case is whether the defendant acted in good faith" and that good faith is a defense to the crimes charged "if you find that the defendant did not act with the intent to defraud[.]"

[¶46.] In his closing argument to the jury, counsel for Clemensen cited Instruction 21 when arguing that Clemensen acted in good faith when he signed the mortgages using the POA, and he relied on the fact that the lenders approved his

_____

(. . . continued)
(holding that the defendant waived his venue challenge, given that he did not raise an objection below).

signing in that capacity. He also argued that Clemensen acted in good faith when he used the funds transferred from Betty's Edward Jones account because Betty approved the loans and transfers. On this basis, Clemensen's counsel argued there was no intent to defraud.

[¶47.] On appeal, Clemensen now claims that Instruction 21 did not go far enough. Asserting that good faith is an affirmative defense, Clemensen argues that the court failed to instruct the jury that the State bears the burden of proving the defendant did not act in good faith. He contends that the jury would have been informed of the State's burden in this regard if the court had given another instruction, South Dakota Criminal Pattern Jury Instruction 2-2-1.[9] He acknowledges that he did not propose the instruction below, and therefore asks this Court to review the circuit court's failure to sua sponte give this pattern instruction for plain error.

---

9. South Dakota Criminal Pattern Instruction 2-2-1, regarding a "claim of right" raised as a defense to a theft charge, reads:

> Evidence has been introduced that the defendant [was unaware that the property taken was that of another] [acted under an honest and reasonable claim of right to the property involved] [had a right to acquire or dispose of the property as was done]. The state must prove beyond a reasonable doubt that the defendant acted with the specific intent to _____.
>
> If you find that the defendant [was unaware that the property taken was that of another] [acted under an honest and reasonable claim of right to the property involved] [had a right to acquire or dispose of the property as was done], the specific intent essential to the crime of _____ is lacking and if you find that the state has failed to prove beyond a reasonable doubt that the defendant acted with such specific intent you must find the defendant not guilty.

[¶48.]    "When an issue is not preserved for appeal, this Court is limited to a review for plain error." *State v. Robertson*, 2023 S.D. 19, ¶ 18, 990 N.W.2d 96, 101 (citation omitted). "We invoke *our discretion* under the plain error rule cautiously and only in '*exceptional circumstances.*'" *State v. McMillen*, 2019 S.D. 40, ¶ 13, 931 N.W.2d 725, 729 (citation omitted). "To establish plain error, an appellant must show (1) error, (2) that is plain, (3) affecting substantial rights; and only then may this Court exercise its discretion to notice the error if, (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* ¶ 13, 931 N.W.2d at 729–30 (citation modified). As to the third prong, "the defendant bears the burden of showing the error was prejudicial." *Id.* at 730 (citation omitted). "'Prejudice' in the context of plain error requires a showing of a 'reasonable probability' that, but for the error, the result of the proceeding would have been different." *State v. O'Brien*, 2024 S.D. 52, ¶ 31, 11 N.W.3d 881, 890 (citation omitted).

[¶49.]    The essence of Clemensen's defense is that, because he claims his actions were taken in good faith, he lacked the requisite intent to defraud, an essential element of the statute. But Instruction 21 made it clear to the jury that if it finds Clemensen did not act with intent to defraud, then he could not be convicted. Instruction 21 further explained that "[t]he State has the burden of proving beyond a reasonable doubt that the defendant acted with the intent to defraud. Evidence that the defendant acted in good faith may be considered by you, together with all the other evidence, in determining whether or not the defendant acted with intent to defraud." It is clear that Instruction 21 informed the jury

regarding the State's burden of proof and it contains essentially the same language found in Criminal Pattern Instruction 2-2-1 regarding the State's burden. For this reason, we discern no error. *See Pfeiffer*, 2024 S.D. 71, ¶ 42, 14 N.W.3d at 649 (recognizing that there is no abuse of discretion when a circuit court does not give an instruction on a legal principle already embodied in other instructions).

[¶50.]     We affirm.

[¶51.]     JENSEN, Chief Justice, and KERN, SALTER, and MYREN, Justices, concur.